479 A.2d 903

**Michael Keith LITTLE**

v.

**STATE of Maryland.**

**Daniel Lenwood ODOM**

v.

**STATE of Maryland.**

**Nos. 158, 159, Sept. Term, 1983.**

Court of Appeals of Maryland.

Aug. 21, 1984.

486

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Deborah K. Chasanow, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired) Specially Assigned.

MURPHY, Chief Judge.

This case concerns the legality of police roadblocks established in furtherance of a state operated sobriety checkpoint program to detect and deter drunk driving.

## I.

As part of an effort to stop drunk driving, the Maryland State Police augmented its conventional enforcement methods by erecting systematic roadblocks on state roads having high alcohol related accident rates. The sobriety checkpoints were established pursuant to a pilot program implemented on a limited basis in Harford County for a three-month period beginning on December 12, 1982. Checkpoints were erected in the county on seven days during this period; they were in operation between 11 p.m. and 4 a.m. on December 17, 18, 26 and 31, 1982, on January 6 and 21, 1983 and on February 18, 1983.[1]

Harford County was selected because it had a relatively high rate of alcohol related traffic fatalities that did not vary seasonally. Additionally, the county was unaffected by the sobriety checkpoints operated in the Washington, D.C. suburbs by the Montgomery and Prince George's County Police Departments. Extensive statewide publicity accompanied the commencement of the pilot program. Press conferences were held in Harford County and Annapolis; a complete demonstration was staged at a mock checkpoint. These events received widespread media coverage. There was live television coverage of the first roadblock

---

1. Checkpoints were also established on February 25 and 26 in Carroll County and March 12 and 17 in Cecil County. They covered the same hours as in Harford County, since statistics indicated that drunk driving is most prevalent from 8 p.m. to 4 a.m.

which was operated on December 17, 1982; its exact location was disclosed at that time.

Comprehensive regulations governed the operation of the sobriety checkpoint program. They were reviewed and approved by the Superintendent of the Maryland State Police, the Attorney General and the Governor. As prescribed in the regulations, the roadblock locations were selected on the basis of data on alcohol related accidents supplied by the State Highway Administration. The date, time and location of each checkpoint required the approval of the Chief of the Field Operations Bureau of the State Police. Three sites were selected for each night the checkpoints were in operation. The police team charged with operating the roadblocks was authorized to alternate between these sites, with the decision to move the location being vested in the commissioned officer in charge. One factor influencing this decision was whether traffic passing through the checkpoint was too light or too heavy.

The safety of motorists and State Police officers was a primary consideration in the selection of checkpoint sites. Accordingly, roadblocks were established only where there were long stretches of straight level road giving drivers sufficient distance to stop their vehicles safely, adequate shoulders at least twelve to eighteen feet wide, and a manageable amount of traffic during the roadblock's hours of operation. At each of the roadblock sites used during the pilot program, there was a safe place for motorists to make a U-turn before reaching the checkpoint. In instances where traffic became congested at the checkpoint site, the commissioned officer in charge was empowered to suspend the operation temporarily until the congestion was relieved.

The regulations prescribed the arrangement of each checkpoint. A twenty-square-foot sign is placed two-hundred to three-hundred feet in front of each checkpoint. The signs say "Stop Ahead, Sobriety Checkpoint" and contain the State Police seal. The checkpoints are manned by nine uniformed officers wearing reflecting safety vests; at least

one commissioned officer is present to supervise. Checkpoints are illuminated by flares and marked with additional signs to control traffic. State Police vehicles are parked on each side of the roadblock with their emergency lights activated. Troopers signal traffic to halt by using flashlights; no barricades are placed on the roadway.

The regulations detail the duties of each officer attending the roadblock:

"All traffic approaching the checkpoint will be stopped as long as traffic congestion does not occur. The trooper will approach each motorist and state, 'I am Trooper *(John Doe)* of the Maryland State Police. You have been stopped at a sobriety checkpoint set up to identify drunk drivers.' If there is no immediate evidence of intoxication, a traffic safety brochure developed specifically for this enforcement strategy will be given to the motorist. The trooper will suggest to the motorist that he read the brochure at a later time for a more complete explanation of the stop. The motorist will then be assisted to safely proceed."

The brochures also contain a questionnaire for the motorist to return with comments about the program. Each checkpoint stop lasts between fifteen and thirty seconds.

The regulations instruct officers to look for the following articulable signs of intoxication: "an odor of alcoholic beverage about the driver, slurred speech, the general appearance, and/or other behavior normally associated with D.W.I. violators." If these observations give the officer reason to believe that the driver may be intoxicated, the vehicle may be referred to the shoulder for additional investigation. There, the motorist is asked to produce a driver's license and vehicle registration and may be asked to perform certain coordination tests.[2] If these tests produce sufficient evidence of intoxication, the motorist is arrested.

---

**2.** These maneuvers, usually referred to as field sobriety tests, commonly include walking a straight line, touching the fingers to the nose, standing on one foot and reciting the alphabet.

A motorist wishing to avoid a sobriety checkpoint may make a U-turn or turn onto a side road prior to reaching the roadblock. No action is taken against a driver doing so unless the motorist drives erratically. For example, on several occasions, drivers ran off the road while trying to turn around and they were stopped. Likewise, a driver who stops at the checkpoint but refuses to roll down the car window is allowed to proceed. If other signs of intoxication are observed, the driver may be followed to detect signs of erratic driving. The officers operating the checkpoint do not search the interior of the vehicle or its occupants. A flashlight is used to illuminate the driver only; the officers do not inspect the area around the driver or the remainder of the passenger compartment.

Appellant Odom was stopped at a sobriety checkpoint on Route 24 in Harford County at 2:55 a.m. on January 1, 1983. State Trooper Meeks detected a strong odor of alcohol and observed that Odom's face was flushed red and that his eyes were glassy and bloodshot. Odom "kept sticking his head inside the vehicle" to prevent Meeks from smelling his breath. Meeks asked Odom to pull his vehicle to the side of the road and to perform several field sobriety tests. He was arrested after performing poorly on the tests.

Appellant Little was stopped at 1:50 a.m. by State Trooper Adams at the same checkpoint. Little brought his vehicle to a "jerking stop" and rolled down the window about three inches. Adams detected a very strong odor of alcohol and observed that Little's eyes were bloodshot and "bugged out" and that his face was red. Little was asked to pull onto the shoulder and perform several field sobriety tests. He stumbled while getting out of his car, bumping into the door. After performing poorly on the tests, he was arrested.

Both appellants were charged with driving while intoxicated. Each filed a motion to suppress all evidence obtained as a result of the roadblock stops, claiming violation of their constitutional rights. The Circuit Court for Har-

ford County (Cameron, J.) denied the motions and subsequently found Odom guilty of driving while under the influence of alcohol and Little guilty of driving while intoxicated. Each appealed. We granted certiorari prior to consideration of the appeals by the intermediate appellate court primarily to determine whether the challenged roadblocks violated appellants' constitutional rights under the Fourth Amendment to the federal constitution and Article 26 of the Maryland Declaration of Rights.[3]

## II.

It is well recognized that stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, even though the purpose of the stop is limited and the resulting detention is quite brief. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–558, 96 S.Ct. 3074, 3082–3083, 49 L.Ed.2d 1116 (1976). The Fourth Amendment, however, does not prohibit all seizures but only those which are unreasonable. *Department of Transportation v. Armacost*, 299 Md. 392, 407, 474 A.2d 191 (1984); *Givner v. State*, 210 Md. 484, 494–495, 124 A.2d 764 (1956). In other words, as the Supreme Court made clear both in *Prouse* and *Martinez-Fuerte*, such seizures are not per se violative of the Fourth Amendment simply because the stop was not based on either probable cause to believe or reasonable suspicion that

---

**3.** Article 26 provides:
  "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grevious [grievous] and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."
  We have said that Art. 26 is *in pari materia* with its federal counterpart and that decisions of the Supreme Court interpreting the Fourth Amendment are entitled to great respect. *Gahan v. State*, 290 Md. 310, 430 A.2d 49 (1981).

the motorist was engaged in conduct in violation of the criminal law. As *Prouse* states, 440 U.S. at 653–654, 99 S.Ct. at 1395–1396, the essential purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by governmental officers in order to safeguard the privacy and security of individuals against arbitrary invasions. Hence, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 654, 99 S.Ct. at 1396. And, as *Prouse* further makes plain, "the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." [4] *Id.*

The application of these constitutional principles to the stopping of motorists is well illustrated by the cases. In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), Border Patrol officers pursued and stopped a car carrying several illegal immigrants. Their only reason for choosing that particular vehicle was the apparent Mexican ancestry of the passengers. The Court held that the stop constituted a "seizure" within the meaning of the Fourth Amendment. *Id.* at 878, 95 S.Ct. at 2578. Balancing the public interest against the interference with individual liberty, the Court found that the roving stops were unreasonable when not based on individualized suspicion. *Id.* at 883, 95 S.Ct. at 2581. The Court recognized the strong public interest in stemming the tide of illegal aliens. It held, however, that the degree of interfer-

---

**4.** It is nevertheless the general rule that law enforcement officers may not detain an individual temporarily unless the officer has some articulable reason for believing that the suspect is or has been engaged in criminal activity. *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Mosley v. State,* 289 Md. 571, 577–78, 425 A.2d 1039 (1981); *Watkins v. State,* 288 Md. 597, 602, 420 A.2d 270 (1980).

ence with lawful traffic was not justified. The Court concluded:

> "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582 (footnote omitted).

In *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court held that stops made without individualized suspicion at fixed roadblocks did not violate the Fourth Amendment. The defendants had been stopped at a permanent Border Patrol checkpoint. All traffic passing through the checkpoint was screened and most vehicles were allowed to proceed without further interruption. If an officer found a particular vehicle to be suspicious, it was detained at a secondary inspection area while the occupants were questioned about their citizenship. The Court found that the need for the checkpoints was great because the flow of illegal aliens could not be otherwise controlled effectively at a 2000-mile border. Therefore, the Court reasoned, checkpoints located on major highways were needed to deny illegal aliens a quick and safe route into the interior. A requirement that stops be based on reasonable suspicion would be impractical, the Court said, because "such a requirement would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly." *Id.* at 557, 96 S.Ct. at 3083. Balanced against this strong government interest, the Court found that the intrusion on Fourth Amendment interests occasioned by routine checkpoint stops "is quite limited." *Id.* It said:

> "This objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is

appreciably less in the case of a checkpoint stop. In [*United States v. Ortiz*, 422 U.S. 891, 894–95, 95 S.Ct. 2585 [2587–2588], 45 L.Ed.2d 623 (1975) ], we noted:

'[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' "

*Id.* at 558, 96 S.Ct. at 3083.

Compared with the roving-patrol stops involved in *Brignoni-Ponce, supra,* the Court said that "[r]outine checkpoint stops do not intrude similarly on the motoring public." *Id.* at 559, 96 S.Ct. at 3083. It continued by noting:

"First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unrea-

sonable is subject to post-stop judicial review." *Id.* at 559, 96 S.Ct. at 3083–3084 (footnote omitted).

The Court concluded that the checkpoint stops made without individualized suspicion were constitutional. *Id.* at 562, 96 S.Ct. at 3085. It also said that the intrusions caused by directing motorists to a secondary inspection area were minimal; that referrals could be made on criteria that would not sustain a roving-patrol stop; and that individualized suspicion was not required. *Id.* at 563, 96 S.Ct. at 3085.

In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court struck down the use of random driver's license and vehicle registration checks not based on probable cause or articulable suspicion. The Court found these random stops as intrusive as the stops made by the roving patrols in *Brignoni-Ponce, supra.* It said:

"Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community." *Id.* at 657, 99 S.Ct. at 1398.

The Court found that the state's interest in enforcing the license and registration laws could be served by more effective alternatives and concluded that the state's interest was outweighed by the intrusiveness of the stops. *Id.* at 661, 99 S.Ct. at 1400.

Although the Court has not directly addressed the constitutionality of temporary roadblocks set up to enforce traffic

laws, it has suggested that this method would be permissible. In *Prouse*, it said:

"[Our] holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. at 1401 (footnote omitted).

The Court noted in *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640, that as an alternative to a stop based on a reasonable, articulable suspicion, a seizure may "be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Commenting on *Prouse*, the Court in *United States v. Villamonte-Marquez*, 462 U.S. 579, ——, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983) said that

"alternative methods, such as spot checks that involve less intrusion, or questioning of all oncoming traffic at roadblock-type stops, would just as readily accomplish the State's objectives in furthering compliance with auto registration and safety laws.

\*       \*       \*       \*       \*       \*

"... Random stops without any articulable suspicion of vehicles away from the border are not permissible under the Fourth Amendment [citations omitted] but stops at fixed checkpoints or at roadblocks are." 103 S.Ct. at 2582.

In applying the rules enunciated by the Supreme Court, some courts have found roadblocks to be unconstitutional where the authorities did not provide adequate procedures for limiting the discretion of field officers. In *State v. Hilleshiem*, 291 N.W.2d 314 (Iowa 1980), two police officers decided to stop all vehicles entering a city park during the evening. Their purpose was to identify potential suspects if any vandalism occurred during those hours. They established their roadblock without the knowledge or authoriza-

tion of their superiors. Because there were only two officers, they could not stop all vehicles entering the park. The court held that the stops made by the officers violated the Fourth Amendment. It noted that the checkpoint was "haphazardly located by officers in the field"; that there were no signs warning drivers of the roadblock; that it was not adequately illuminated; that vehicles were not stopped systematically; and that no provision was made for maintaining the roadblock for a significant period. *Id.* at 318–19. The court indicated that the use of roadblocks would be valid where there existed:

"(1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to 'show ... the police power of the community;' and (4) a predetermination by policymaking administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria." *Id.* at 318.

Similarly, in *Com. v. McGeoghegan*, 389 Mass. 137, 449 N.E.2d 349 (1983), the court declared unconstitutional a sobriety checkpoint. The court found that the checkpoint was poorly illuminated and unsafe; that field officers determined the procedures governing the operation of the roadblock and decided which vehicles would be stopped; that the roadblock caused traffic to back up for at least two-thirds of a mile; and that inadequate warning was given to approaching motorists. 449 N.E.2d at 353. The court said:

"For a roadblock to be permissible, it appears that the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized, and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel. While we do not suggest that advance notice is a constitu-

tional necessity, advance publication of the date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear, and inconvenience." *Id.*

In *State v. Olgaard*, 248 N.W.2d 392 (S.D.1976), the court declared unconstitutional the operation of a sobriety checkpoint for two reasons. First, the court said, no warning was given to oncoming drivers. Second, supervisory law enforcement officials did not establish any guidelines governing the location and operation of the checkpoints. *Id.* at 394–95. The court concluded that the stops made at the roadblock were indistinguishable from those made by the roving patrols in *Brignoni-Ponce, supra. Olgaard, supra,* 248 N.W.2d at 395.

The same result was reached in *State ex rel. Ekstrom v. Justice Ct. of State,* 136 Ariz. 1, 663 P.2d 992 (1983). In that case, the court found:

"The roadblocks were set up at the discretion of a local highway patrolman and were operated without specific directions or guidelines. Officers were uncertain whether they should simply question the occupants of motor vehicles or whether they should seize the opportunity to cursorily search the vehicles for evidence of a violation. Motorists were taken by surprise, not having had prior notice of the location and purpose of the checkpoints." 663 P.2d at 996.

The court moreover noted the absence of any statistics concerning the effectiveness of the roadblocks. It concluded that upon the record made in the case the intrusiveness of the roadblocks outweighed the state's law enforcement interest. *Id. See also* the pre-*Prouse* cases of *United States v. Maxwell,* 565 F.2d 596 (9th Cir.1977) (stop at checkpoint set up to detect illegal aliens unlawful because the roadblock was temporary); and *United States v. Sandoval-Ruano,* 436 F.Supp. 734 (S.D.Cal.1977) (border checkpoint held unconstitutional because its location was determined by a field officer and because insufficient advance

notice was given to drivers). *See also State v. Smith,* 674 P.2d 562 (Okla.Crim.App.1984) (temporary sobriety checkpoint unconstitutional because it is more likely to cause fear and surprise than a permanent facility); *Koonce v. State,* 651 S.W.2d 46 (Tex.App.1983) (driver's license checkpoint held unconstitutional because there was no evidence that it was operated pursuant to objective, nondiscretionary, departmental procedures).

A majority of courts, however, have sustained the use of roadblocks as a proper law enforcement tool. As a general rule, the constitutionality of traffic checkpoints has been upheld where: (1) the discretion of the officers in the field is carefully circumscribed by clear objective regulations established by high level administrative officials; (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) the likelihood of apprehension, fear or surprise is reduced by a display of legitimate police authority at the roadblock; and (4) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons.

Illustrative is *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983). There, the court sustained the validity of a sobriety checkpoint established to deter and apprehend drunk drivers. In balancing the government's interest against the intrusion on individual liberty, the court indicated that the following factors should be considered:

"(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any

other relevant circumstances which might bear upon the test." 673 P.2d at 1185.

The court found that the location of the roadblock was selected by supervisory personnel and not by officers in the field; that participating officers were briefed in advance about the procedures to be followed; that the site was well lighted, the officers were in uniform and the emergency lights on the patrol cars were activated; that vehicles traveling in either direction were stopped and therefore officers in the field had no discretion to decide which motorists to detain; and that the time of the initial detention was limited unless the inspecting officer detected reasonable grounds for further investigation. On balance, the court concluded that the intrusion caused by the roadblock stops was reasonable under the applicable Fourth Amendment standard.

Consideration of the factors discussed in *Deskins* has led other courts to uphold the validity of roadblocks in varying circumstances. *See United States v. Prichard,* 645 F.2d 854 (10th Cir.1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981) (constitutionality of license and registration checkpoint at which all passenger cars were stopped upheld on basis of dicta from *Prouse, supra* ); *United States v. Miller,* 608 F.2d 1089 (5th Cir.1979), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980) (stating in dicta that temporary roadblocks are permissible under *Prouse* ); *United States v. Millar,* 543 F.2d 1280 (10th Cir.1976) (constitutionality of license and registration checkpoint upheld); *United States v. Croft,* 429 F.2d 884 (10th Cir.1970) (same); *United States v. Obregon,* 573 F.Supp. 876 (D.N.M.1983) (same); *State v. Swift,* 232 Ga. 535, 207 S.E.2d 459 (1974) (sustaining validity of license and registration checkpoint set up outside a rock music concert); *State v. Roberson,* 165 Ga.App. 727, 302 S.E.2d 591 (1983) (upholding constitutionality of stop made at roadblock established to check drivers' licenses); *People v. Meitz,* 95 Ill. App.3d 1033, 51 Ill.Dec. 561, 420 N.E.2d 1119 (1981) (finding no constitutional violation where police stopped all cars of

certain make and model exiting a parking lot from which vehicles of that type had recently been stolen); *People v. Estrada,* 68 Ill.App.3d 272, 24 Ill.Dec. 924, 386 N.E.2d 128 (1979), *cert. denied,* 444 U.S. 968, 100 S.Ct. 459, 62 L.Ed.2d 382 (1979) (vehicle safety equipment inspections conducted in a systematic, nondiscretionary manner at roadblocks are valid under Fourth Amendment); *Miller v. State,* 373 So.2d 1004 (Miss.1979) (constitutionality of driver's license checkpoint upheld); *People v. John BB.,* 56 N.Y.2d 482, 438 N.E.2d 864, 453 N.Y.S.2d 158 (1982) (sustaining validity of roadblock erected on rural road to stop all traffic as part of an investigation into off-season burglaries of vacation homes); *State v. Tourtillott,* 289 Or. 845, 618 P.2d 423 (1980), *cert. denied,* 451 U.S. 972 (1981) (roadblock established to check hunting licenses and compliance with game laws found constitutional); *State v. Schroeder,* 66 Or.App. 754, 675 P.2d 1111 (1984), *petition for review denied,* 296 Or. 648, 678 P.2d 1227 (1984) (upholding constitutionality of sobriety checkpoints in reliance on *Tourtillott, supra* ); *State v. Shankle,* 58 Or.App. 134, 647 P.2d 959 (1982) (license, registration and vehicle safety equipment checkpoint found valid under the Fourth Amendment); *State v. Halverson,* 277 N.W.2d 723 (S.D.1979) (roadblock erected to enforce game laws held constitutional). In decisions made prior to the Supreme Court Border Patrol checkpoint cases, courts uniformly upheld the validity of roadblocks set up to check drivers' licenses and vehicle registration. *See City of Miami v. Aronovitz,* 114 So.2d 784 (Fla.1959); *Commonwealth v. Mitchell,* 355 S.W.2d 686 (Ky.1962); *Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So.2d 512 (1963); *State v. Kabayama,* 98 N.J.Super. 85, 236 A.2d 164 (1967), *aff'd,* 52 N.J. 507, 246 A.2d 714 (1968); 7A Am.Jur.2d *Automobiles and Highway Traffic,* § 101 at 273 (1980); 60 C.J.S. *Motor Vehicles* § 157 at 807–08 (1969).

Accepting the applicability of the foregoing principles, appellants argue that the intrusiveness of the checkpoint stops far outweighs the State's interest in stopping drunk driving. They suggest that the illumination of the driver

with a flashlight is a "startling invasion of privacy [that] may be physically insufferable to a pair of eyes that have become accustomed to the night's darkness." Appellants contend that unanticipated roadblocks are likely to surprise and annoy drivers; that too much discretion is given to the police in deciding which drivers to detain for interrogation and when to suspend or move the checkpoint; and that the checkpoints are ineffective and unnecessary in that conventional enforcement methods provide a less intrusive but more effective alternative. Thus, appellants conclude that the checkpoint program is unreasonable because the State's law enforcement interest is only marginally advanced while the exercise of personal liberty is substantially impaired.

█ We find that no Fourth Amendment or Article 26 violation occurred when appellants were stopped at the sobriety checkpoint involved in the present case. Clearly the State has a compelling interest in controlling drunk driving. Indeed, as the record discloses, about sixty percent of the drivers killed in automobile accidents have elevated levels of alcohol in their blood; nationally, fifty-five percent of all traffic fatalities are alcohol related. The magnitude of the problem created by intoxicated motorists cannot be exaggerated. As the Supreme Court said recently in *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983):

> "The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. *See Breithaupt v. Abram,* 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957) ('The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield'); *Tate v. Short,* 401 U.S. 395, 401, 91 S.Ct. 668, 672, 28 L.Ed.2d 130 (1971) (BLACK-MUN, J., concurring) (deploring 'traffic irresponsibility

and the frightful carnage it spews upon our highways'); *Perez v. Campbell*, 402 U.S. 637, 657 and 672, 91 S.Ct. 1704, 1715 and 1722, 29 L.Ed.2d 233 (1971) (BLACKMUN, J., concurring) ('The slaughter on the highways of this Nation exceeds the death toll of all our wars'); *Mackey v. Montrym*, 443 U.S. 1, 17–18, 99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321 (1979) (recognizing the 'compelling interest in highway safety')."

The record before us demonstrates that for the limited period of its operation, the sobriety checkpoint program has been a moderately effective technique for detecting and deterring the drunk driver. The State's statistics show, for example, that there was a seventeen percent decrease in alcohol related accidents in Harford County compared with the preceding three-month period. Comparing this statistic with statistics maintained for less populous Frederick County, where the sobriety checkpoint program was not in operation, reveals that conventional drunk driving techniques in the latter county achieved only a twelve percent decrease. During the period of the pilot program, traffic fatalities declined from eleven to eight in Harford County; Frederick County recorded three fatalities compared with four in the preceding three months. When compared with the same three month period of the previous year, Harford County achieved a ten percent reduction in alcohol related accidents; there was a similar decline in Frederick County when the same periods are compared.[5] Of greater significance is the evidence in the record indicating that the pilot program had a substantial impact on the drunk driving problem. Police attending the checkpoints found that many drunk individuals asked a sober spouse or companion to drive instead. Taxi companies reported a substantial increase in business from intoxicated persons who had been

---

5. There were eight fatalities in Harford County during the pilot program compared with three during the same three months in the previous year. Frederick County recorded three deaths compared with ten the year before.

deterred from driving. Furthermore, some groups chartered buses or other vehicles to transport revelers. The prospect of being stopped at a roadblock thus convinced some intoxicated individuals to find alternate means of transportation.

Balanced against the State's compelling interest in detecting and deterring drunk driving, the intrusion on individual liberties caused by the checkpoints is minimal. The checkpoints are operated under limitations imposed by clear, carefully crafted regulations approved by high level administrators. The regulations severely restrict the discretion of the officers in the field. All vehicles are stopped; there is virtually no risk that motorists will be singled out arbitrarily. The procedures to be followed when communicating with each driver are set forth in detail in the regulations; thus, the risk of police harassment is greatly reduced. The amount of fright and annoyance caused to motorists who pass through the checkpoints is minimal. Adequate advance warning of the checkpoint is given; motorists who do not wish to stop may make a U-turn and follow a different route. Moreover, a driver who stops at the checkpoint but refuses to roll down the car window is allowed to proceed. The stops themselves last less than a half a minute. Officers do not interrogate motorists or search their vehicles. Each checkpoint is well illuminated and staffed by a sufficient number of uniformed officers to show that it is a legitimate exercise of police authority. Ample provision is made for the safety and convenience of the public; operation of the checkpoints is suspended if traffic becomes congested. The sobriety checkpoints are operated pursuant to a comprehensive set of detailed regulations; they function in a manner that minimizes the possibility of fright and inconvenience to the public. In this regard, we think the effect upon the motorist resulting from the officer's use of a flashlight is greatly exaggerated by appellants.

We next focus upon appellant's contention that although permanent roadblocks may be permissible under some cir-

cumstances, temporary checkpoints of the kind used in this case are prohibited by the Fourth Amendment. In *Martinez-Fuerte, supra*, 428 U.S. at 559, 96 S.Ct. at 3083, the Court noted that with the use of permanent roadblocks,

"the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere."

Appellants suggest that because the police did not give advance notice of the location of the Harford County sobriety checkpoints, motorists, when stopped, were completely surprised. Consequently, they claim, the intrusiveness of the checkpoint stops outweighs the state's law enforcement interests. We disagree.

The temporary nature of sobriety checkpoints does not render them unconstitutional. In *Martinez-Fuerte, supra*, the Court indicated that the permanence of the roadblock facility was only one of many factors to be considered when evaluating the validity of this law enforcement technique. The Court said that the permanent nature of the Border Patrol checkpoint there involved was one factor considered in determining reasonableness under the applicable Fourth Amendment balancing test. This does not mean, however, that under different circumstances, a temporary roadblock established under a systematic plan, as here, would be unreasonable. Although the degree of surprise occasioned by the temporary roadblock may be somewhat greater, we think the intrusiveness of the checkpoints is still outweighed by the State's compelling interest in preventing drunk driving. It is true that, unlike the situation in *Martinez-Fuerte*, motorists stopped at the Harford County checkpoints could not learn in advance of their location. Nevertheless, approaching drivers were given notice of the roadblock and an opportunity to turn around. No driver was forced to pass through a checkpoint; all were free to select an alternate route and proceed unimpeded.

Nor do we think the temporary nature of sobriety checkpoints makes them analogous to the roving-patrol stops declared unconstitutional in *Brignoni-Ponce* and *Prouse*, both *supra*. As the Court observed in *Martinez-Fuerte*, *supra*, 428 U.S. at 558, 96 S.Ct. at 3083, the objective intrusion—the stop, the questioning and the superficial visual inspection—is the same. The subjective intrusion at a permanent or temporary roadblock is far less, however. This is so because the discretion of the field officers at a properly conducted roadblock is carefully circumscribed; motorists stopped can see that they are not being singled out for arbitrary enforcement or harassment.

■ Appellants also argue that the operation of the checkpoints without the authorization of a warrant was unlawful. We think *United States v. Martinez-Fuerte*, *supra*, is dispositive on this point. It was there argued that stops made at a permanent Border Patrol checkpoint were unlawful because the roadblock was not authorized by a warrant. The Court held that it was not necessary to obtain prior judicial authorization for the checkpoint's location or for the practice of making the routine stops. The Court distinguished *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) which held that an "area" warrant was required before a building code inspection could be made. The Court noted that *Camara* involved the search of private residences for which a warrant traditionally has been required. It said:

"[T]he strong Fourth Amendment interests that justify the warrant requirement in that context are absent here. The degree of intrusion upon privacy that may be occasioned by a search of a house hardly can be compared with the minor interference with privacy resulting from the mere stop for questioning as to residence." *Id.* at 565, 96 S.Ct. at 3086.

Furthermore, the Court observed, the Fourth Amendment interests served by the warrant requirement in administrative search cases would not be advanced by its application

to roadblocks. First, the visible manifestations of official authority at the checkpoint assure the motorist that the officers are acting within their power. Second, there is little chance that hindsight will color an evaluation of the reasonableness of the seizure. The Court said:

> "The reasonableness of checkpoint stops ... turns on factors such as the location and method of operation of the checkpoint, factors that are not susceptible to the distortion of hindsight, and therefore will be open to post-stop review notwithstanding the absence of a warrant." *Id.* at 565–66, 96 S.Ct. at 3086.

Finally, the need to substitute the judgment of the magistrate for that of the officer was not present, the Court observed, because at checkpoints

> "the decision to 'seize' is not entirely in the hands of the officer in the field, and deference is to be given to the administrative decisions of higher ranking officials." *Id.* at 566, 96 S.Ct. at 3086–3087.

For the reasons articulated by the Supreme Court in *Martinez-Fuerte*, we hold that no warrant authorizing the checkpoint at issue in this case was required.

### III.

The use of sobriety checkpoints raises another question under our grant of certiorari which is wholly distinct from the constitutional question, *i.e.*, whether the operation of the checkpoints violates the Maryland common law of arrest. It is well accepted that an officer has no authority to make a warrantless arrest unless (1) a misdemeanor has been committed in the officer's presence or (2) there is probable cause to believe that the arrestee has committed a felony. Maryland Code (1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 594B (codifying the common law); *Shipley v. State*, 235 Md. 408, 411, 201 A.2d 773 (1964). Concededly, the drivers stopped at sobriety checkpoints are not criminal suspects. Consequently, sobriety checkpoints may be invalid under state common law if a stop made there constitutes an arrest under Maryland law. We have de-

fined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. *Bouldin v. State,* 276 Md. 511, 516, 350 A.2d 130 (1976); *Cornish v. State,* 215 Md. 64, 137 A.2d 170 (1957). An arrest is effected (1) when the arrestee is physically restrained or (2) when the arrestee is told of the arrest and submits. *Bouldin, supra,* 276 Md. at 516, 350 A.2d 130. In sum, "an arrest is the taking, seizing or detaining of the person of another, *inter alia,* by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." *Morton v. State,* 284 Md. 526, 530, 397 A.2d 1385 (1979). When a person is merely approached by an officer and questioned briefly about his identity, however, there is no formal arrest under Maryland common law. *Foster & Foster v. State,* 272 Md. 273, 323 A.2d 419 (1974), *cert. denied,* 419 U.S. 1036, 95 S.Ct. 520, 42 L.Ed.2d 311 (1974); *Duffy v. State,* 243 Md. 425, 221 A.2d 653 (1966); *Shipley v. State,* 243 Md. 262, 220 A.2d 585 (1966); *Jones v. State,* 242 Md. 95, 218 A.2d 7 (1966); *Cornish, supra;* E. Fisher, *Laws of Arrest* § 37 at 76–77 (1967). Likewise, it is well accepted that a motorist who is merely stopped for investigative purposes such as a license and registration check is not under formal arrest. Fisher, *Laws of Arrest, supra,* § 37 at 73; 61A C.J.S. *Motor Vehicles* § 593(2) at 284 (1970). The Supreme Court's recent decision in *Berkemer v. McCarty,* —— U.S. ——, 104 S.Ct. 3138, 82 L.Ed.2d 317 [1984] is also noteworthy. There, the defendant was observed driving erratically and was stopped by a police officer. He was questioned briefly, asked to produce a driver's license and registration, and requested to perform field sobriety tests. The Court held that this was not custodial interrogation requiring *Miranda* warnings. In so holding, the Court said: "Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." —— U.S. at ——, 104 S.Ct. at 3152.

■ As a general rule, stops made without suspicion at roadblocks set up to check licenses and registration are not

inconsistent with the common law of arrest. Fisher, *Laws of Arrest, supra,* § 38 at 82; 7A Am.Jur.2d *Automobiles and Highway Traffic* § 101 at 273 (1980); 61A C.J.S. *Motor Vehicles* § 593(a) at 283 (1970). Concerning this type of roadblock, the court in *Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So.2d 512, 514 (1963), said:

> "The mere act of stopping cars and detaining drivers momentarily for the purpose of ascertaining whether they are duly licensed to operate a motor vehicle does not constitute an arrest."

*See also Mincy v. District of Columbia,* 218 A.2d 507, 508 (D.C.1966); *State v. Fish,* 280 Minn. 163, 159 N.W.2d 786 (1968).

▆▆▆ The brief detention of the motorist at the sobriety checkpoints here involved does not constitute an arrest under Maryland common law. Drivers are not stopped for the purpose of taking them into custody and prosecuting them. They are not under the control or subject to the will of the officer; they may leave the checkpoint without talking to the authorities or avoid the roadblock altogether by making a U-turn. The stops made at the checkpoints are investigatory in nature and limited in scope; they are comparable to the accosting of an individual in a public area and are not inconsistent with the restrictions on authority imposed by the common law of arrest.

## IV.

▆▆▆▆▆ Appellants also argue that the State Police had no authority to place the signs used at the checkpoints in the roadway. They concede that the State Police are empowered by Code (1979 Repl.Vol., 1983 Cum.Supp.) Article 88B, § 4(a) to deploy roadblocks for purposes of detecting drunk drivers.[6] But this power is limited, they contend, by

---

6. Section 4(a) states:
   "The Superintendent, the deputy superintendent, and employees designated by the Superintendent as police employees shall have throughout the State the same powers, privileges, immunities, and

Code (1977) § 8–646(a) of the Transportation Article which provides in pertinent part:

"(a) *In general.*—Except as permitted by this section or in accordance with a permit obtained from the Administration, a person may not:

(1) ...

(2) Place any structure on any State highway;

(3) ...

(4) ...

(5) ...

(6) Place any obstruction on any State highway."

Appellants claim that this provision requires the State Police to obtain a permit from the State Highway Administration before establishing a roadblock. Because no permit was obtained for the checkpoint at issue here, appellants argue that the State Police acted outside their authority. We disagree. Nothing in § 8–646 was intended to interfere with State Police authority to enforce the State's criminal laws. We think it clear that the State Police were empowered to place signs in the roadway at checkpoint sites. Appellants' argument, we think, is manifestly devoid of merit.[7]

JUDGMENTS AFFIRMED WITH COSTS.

---

defenses as sheriffs, constables, police officers, and other peace officers possessed at common law and may now or hereafter exercise within their respective jurisdictions. Any warrant of arrest may be executed by a police employee in any part of the State without further endorsement."

7. Appellants also claim that their arrests were illegal because the police lacked probable cause to refer them to the shoulder to conduct field sobriety tests. This issue was not raised before the court below in appellants' motions to suppress; the suppression hearing was limited to the determination of the validity of the initial stops. Furthermore, appellants both submitted to a trial on an agreed statement of facts. Thus, there was little evidence concerning what transpired after appellants were stopped. Therefore, there is insufficient evidence in the record upon which to decide this issue. Maryland Rule 885.

DAVIDSON, Judge, dissenting:

In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court held, as the majority notes, that a State's interest in the practice of random spot checks for the purpose of checking driver's licenses and car registrations as a means of promoting public safety was outweighed by the Fourth Amendment intrusion entailed.  There the Supreme Court said:

> The question remains, however, whether in the service of these important ends the discretionary spot check is a sufficiently productive mechanism to justify the intrusion upon the Fourth Amendment interests which such stops entail.  On the record before us, that question must be answered in the negative.  Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment.  *Id.* at 660, 99 S.Ct. at 1399.

Thus the Supreme Court made it plain that in order to justify an intrusion upon Fourth Amendment rights, the State must demonstrate that the particular practice employed is an effective and necessary mechanism by which to promote public safety.

The majority here finds that "[t]he record before us demonstrates that for the limited period of its operation, the sobriety checkpoint program has been a moderately effective technique for detecting and deterring the drunk driver."  In my view, there is neither empirical data, nor any other evidence to support that conclusion.  On the contrary, the record shows that in view of the alternative mechanisms available, the incremental contribution, if any, to highway safety resulting from a program utilizing unpredictably located, non-permanent roadblocks (roadblock program) was too marginal to justify the practice under the Fourth Amendment.  Accordingly, I respectfully dissent.

There is no question that in Maryland, as elsewhere, driving while intoxicated poses a danger to life and property. There is thus no question that the State has a vital interest in insuring that drivers are discouraged from operating motor vehicles while intoxicated.

The record here establishes, however, that this goal was effectively achieved by the use of traditional techniques for deterring and detecting drunk driving. More particularly, the record shows that in 1981 the State established a comprehensive alcohol enforcement program (comprehensive program) the central features of which included retraining police personnel in detection techniques; incentives to encourage the use of those techniques; and a widespread public relations campaign focusing attention on the deleterious effects of drunk driving and the need for families and friends to deter persons from drunk driving. The comprehensive program was to be closely monitored. Its success was to be evaluated by the objective criteria of an increasing number of drunk driving arrests.

The resultant statistics proffered by the State unequivocally establish that through the improvement of traditional methods and techniques the comprehensive program produced substantial increases in drunk driving arrests. For example, in 1980, before the comprehensive program was initiated there were 15,575 drunk driving arrests. In 1981, one year after the comprehensive program was initiated there were 23,575 such arrests. In 1982, after the program was further refined and expanded there were over 33,000 drunk driving arrests—twice the number of arrests that occurred in 1980. Thus the empirical data proffered by the State demonstrates, based on the objective criteria established by the State, that effective alternative methods to a roadblock program were available for the purpose of detecting and deterring drunk drivers.

Moreover, other evidence proffered by the State supported the same conclusion. A police officer who participated in the planning, implementation, and evaluation of the

State's roadblock program testified that the mere presence on the roadway of a marked police car, with its lights flashing "definitely does work as a deterrent against violations" and "increases the awareness of the public of the enforcement." Thus, not only empirical data but also other evidence proffered by the State demonstrates that a roadblock program was unnecessary because effective alternatives were available.

Additionally, the record fails to show any significant incremental contribution to highway safety resulting from the use of a roadblock program. In 1982, an evaluation of the comprehensive program showed that although there had been a dramatic upswing in drunk driving arrests during the initial year there had not been a "corresponding decline in the number of fatal accidents." Accordingly, the State determined to add a roadblock program to the comprehensive program otherwise comprised entirely of traditional techniques. The success of the roadblock program was to be evaluated by the objective criteria of a decreasing number of fatal accidents.

The statistics proffered by the State do in fact show that in 1980 there were 782 fatal accidents; that in 1981 there were 794 fatal accidents; and that in 1982 there were 660 fatal accidents. However, testimony by the police officer who participated in the planning, implementation, and evaluation of the roadblock program reveals that although the decision to add a roadblock program was reached after the evaluation of the 1981 statistics, the roadblock program, in fact, was not implemented until December 1982. Thus, the statistics proffered by the State indicate that the significant decrease in fatal accidents occurring in 1982 was the result of the refined and expanded comprehensive program of traditional methods that was in effect in 1982 and was not attributable to the roadblock program implemented in the latter half of December 1982. Accordingly, as the State conceded at oral argument there is nothing in these statistics to show either that the goal of decreasing fatal accidents could not be achieved through traditional methods or

that the use of a roadblock program incrementally contributed to the achievement of that goal.[1]

More important, some of the other statistics proffered by the State to show the impact of the use of a roadblock program affirmatively indicate that such a practice is not a productive mechanism by which to achieve deterrence and detection of drunk drivers. For example, a pilot roadblock program was implemented in Harford County during December-February, 1982–1983. The control county was to be Frederick County because it was "most nearly comparable to Harford County." Accordingly, no roadblock program was instituted in Frederick County. The comparative results were to be carefully monitored. The program's success was to be evaluated on the basis of objective criteria, including the decrease in alcohol related accidents and fatal accidents.

The comparative statistics proffered by the State show that in Harford County, in the period of December-February, 1981–1982, there were 133 alcohol related accidents and 3 fatal accidents whereas in the pilot program period of December-February, 1982–1983, there were 120 alcohol related accidents, and 8 fatal accidents. Thus, these statistics show that in Harford County although there was a 10% decrease in the number of alcohol related accidents during the pilot roadblock program, there was a 270% increase in fatal accidents. The State's comparative statistics further show that in Frederick County, there were 108 alcohol related accidents and 10 fatal accidents during December-February, 1981–1982, whereas during December-February, 1982–1983, there were 96 alcohol related accidents and 3 fatal accidents. These figures unequivocally establish that despite the absence of any roadblock program in Frederick County there was not only an 11% decrease in the number

---

1. Thus, at oral argument the Assistant Attorney General said:
   "I think if you look at the statistics—statewide, the decrease in the fatalities in 1982 and ... in 1983 indicated that *the entire law enforcement program was resulting in a decrease of fatalities.*"

of alcohol related accidents, but also a 335% decrease in fatal accidents. Thus, these statistics prepared and proffered by the State, dramatically demonstrate that based on the objective criteria established by the State, the Harford County roadblock program was an ineffective technique by which to deter and detect drunk driving. Unlike the majority, I cannot gloss over or ignore the significance of this empirical data.

At oral argument the State candidly conceded that the proffered comparative statistics failed to show that the roadblock program was an incrementally effective technique.[2] In the absence of adequate empirical data the State was compelled to rely upon certain anecdotal material to establish the efficacy of the roadblock program.[3]

An examination of the anecdotal material relied upon by the State reveals that it is no more effective than the empirical data relied upon to establish the incremental contribution of the roadblock program. As noted by the majority, there was evidence in the form of police observations, to show that during the roadblock program some intoxicated individuals were being driven by a sober companion, and that taxis, and in some instances chartered buses were being used to transport revelers. Nevertheless, there was absolutely no testimony concerning these police observations, to indicate what if any portion of this modified behavior was attributable to the existence of the roadblock program rather than the improved traditional methods then simultaneously being employed. Under these circumstances I, unlike the majority, cannot conclude based on these police observations that "[t]he prospect of being stopped at

---

**2.** Thus, at oral argument the Assistant Attorney General said:
"I don't know that the empirical figures in the State of Maryland given a 3 month very short program really are that meaningful in determining that kind of impact."

**3.** Thus, at oral argument the Assistant Attorney General said:
"The evidence I point to to demonstrate that the sobriety checkpoints did have the desired effect are the comments received, the calls that came into the State police, the responses."

a roadblock thus convinced some individuals to find alternative means of transportation," and, consequently, that "the pilot program had a substantial impact on the drunk driving problem."

There was also evidence to show favorable public reaction to the roadblock program. The record however, further shows that the favorable comments were not only based on opinion rather than empirical data, but also were offset by a considerable number of negative comments. For example, in Harford County alone 2,500 persons signed an "anti-sobriety checkpoint" petition. Under those circumstances I, like the majority, place no reliance upon these expressions of public approval, as evidencing the incremental value of the roadblock program.

Finally, the record here shows that the State not only failed to establish that the roadblock program was incrementally effective but additionally admitted at oral argument that its deterrent value would decrease in the future. Throughout this proceeding, the State heavily emphasized the fact that participation in the roadblock program was voluntary because a motorist could avoid the roadblock by making a "U-turn" before reaching it or after stopping at the roadblock could refuse to roll down the car window and proceed without participating in the program. Nevertheless, at oral argument the State made it plain that "it was the fear of having to go through the checkpoint if one was drinking that changed the driving habit." Thus, the State acknowledged that the effectiveness of the roadblock program was largely dependent upon the public's erroneous perception that a stop at a roadblock and participation in the program was mandatory and could not be avoided. Ultimately, the State conceded that as the public became aware of the actual conditions under which the roadblock program was being operated its deterrent value would decrease.[4]

---

4. Thus, at oral argument the Assistant Attorney General said: "It obviously would lessen the deterrent value if we said precisely how limited the program actually is."

When all is said and done the evidence adduced by the State establishes that there were traditional methods then in use or available that effectively achieved the goal of deterring and detecting drunk drivers; that consequently, there was no pressing need for the roadblock program; that there was no significant, if any, incremental contribution resulting from the roadblock program; and that the marginal deterrent effect, if any, resulting from the roadblock program will decrease in the future as the public learns the truth about the program and the conditions under which it operates. In short, there is neither empirical data, nor any other evidence in this record that convinces me that the marginal incremental contribution, if any, of the roadblock program to the deterrence and detection of drunk drivers justified this practice under the Fourth Amendment. *Accord, State ex rel. Ekstrom v. Justice Court of State*, 136 Ariz. 1, 5, 663 P.2d 992, 996 (1983).

In balancing the societal interest in protection from drunk drivers against the individual interest in protection from unreasonable governmental action, I can only conclude that in this case, the individual rights accorded by the Constitution must prevail. As Justice Stewart, writing for a majority of the United States Supreme Court said:

> "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to Constitutional safeguards."

*Almeida-Sanchez v. United States*, 413 U.S. 266, 274, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596.

On the basis of the record before me, I would reverse the convictions and remand for new trials.