553 A.2d 1317

**Robert BROWN, Jr.**

v.

**STATE of Maryland.**

**No. 914, Sept. Term 1988.**

Court of Special Appeals of Maryland.

March 3, 1989.

[black redaction blocks]

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender on the brief), Baltimore, for appellant.

Audrey A. Creighton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County of Salisbury, on the brief), for appellee.

Argued before WILNER, KARWACKI and WENNER, JJ.

WILNER, Judge.

At about 2:30 in the morning of August 7, 1987, agents of the Sheriff's Department of Wicomico County, the Maryland State Police, and the Salisbury Police Department began to implement a pre-planned paramilitary operation unparalleled in the annals of this Court or, we hope, of any other court of this State. They first intended to cordon off an area of Salisbury referred to in the record before us as the "Rose Street Area." Officers were to be stationed at the various exit points from that area to "block off all traffic or anyone that tried to leave from the Rose Street Area." This included "[a]ny vehicle, any person on foot."

Once the blockade was in place, the police intended to move into the area, to accost anyone they found there, to obtain identification, and to detain the person long enough to check for any outstanding warrants. They were also to look for and take action against any drug trafficking.

Deputy Sheriff G.L. Brown was given explicit instructions to block off the area at Rose Street and East Road.

He was to stop any person, driving or on foot, attempting to cross his checkpoint and to "check their identification and everything and run a check...."

Just as Deputy Brown was preparing to take up his position, appellant, who had been parked on Rose Street, started to drive off, proceeding east on Rose Street. Deputy Brown, traveling west on Rose Street, switched on his flashing lights, and swerved in front of appellant, blocking the street. He was promptly joined by another patrol car driven by Deputy Van Meter. At that point, appellant had violated no traffic law and the officers had no reason to suspect that he had done anything wrong. He was stopped solely as part of the dragnet about to be dropped on the whole area.

As Deputy Brown approached appellant's car to demand identification, he "noticed [appellant] moving around in the vehicle" and deduced that appellant "seemed to be awful nervous or something." While appellant was searching for his license and registration, Deputy Brown spotted "alligator clips around his sunvisor"[1] and noticed that "[t]here was a lot of smoke in the vehicle." Brown said that "[i]t didn't appear to smell as though it was ordinary cigarette smoke," but he confessed that he didn't know "what it was." Deputy Brown then ordered appellant to get out of the car because, as he put it,

"there was a female, black female, on the rear seat of the vehicle. When I stopped the vehicle, this female was sitting on the rear seat between the seats of the vehicle. If you—seemed to be bucket seats and I could see her in the back. Once I approached the vehicle, she laid down in the back seat."

At that point, Deputy Van Meter approached appellant and Deputy Brown turned his full attention to the as-yet-un-

---

1. At the suppression hearing, Deputy Brown expressed his belief that "[a]lligator clips are used to hold CDS cigarettes for ingestion by smoking."

identified woman.[2]  According to Deputy Van Meter,

> "As I was approaching, I noticed [appellant] had a large bulge in his left [front] pants pocket.  I suspected this might be a weapon.  I ran my hand *into his pocket* after I told [appellant] to place his hands on his head.  For my protection, I ran my hand *into his pants pocket* and, instead of a weapon, I found a large quantity of suspected crack cocaine in a clear plastic bag."

(Emphasis added.)[3]

Deputy Van Meter immediately placed appellant under arrest and handcuffed him.  He then conducted a search of appellant's person, finding a roll of dollar bills.  Then he searched the car, seizing a brown paper bag containing residue of cocaine, three cigarette lighters, a pipe, and the aforementioned "alligator" clips.[4]

On this evidence, appellant was charged with, convicted of, and sentenced to three years in prison for (1) possession

---

2.  At some point after appellant was ordered out of his car, Deputy Brown ran a computer check on him.  There was no outstanding warrant for his arrest.

3.  Deputy Van Meter was quite clear on this point.  On cross-examination, he testified:
    "Q.  It's further my understanding you testified that you went directly into the defendant's pocket?
    A.  I seen what looked like a bulge and—
    Q.  And you went right into his pocket?
    A.  I went into his pocket.  When I seen the bulge, I went right in his pocket."

4.  At the suppression hearing, Deputy Van Meter claimed that appellant had given verbal consent to the search of the vehicle.  That assertion was never denied by appellant or otherwise rebutted and so we accept it as true.  The circumstances, as described by Deputy Van Meter, were as follows:
    "At that point, Deputy Brown was removing the black female later identified as Alberta Pugh from the back seat of the vehicle.  As she stepped out of the vehicle, I asked [appellant] for permission to search his vehicle.  Deputy Brown was present, Deputy Morgan, a Salisbury City Police officer, Officer Thompson, was present with his K-9.  He has a K-9 that has been trained in the detection of marijuana.  I asked him for permission to search the vehicle and he granted permission."

of with intent to distribute cocaine, (2) simple possession of cocaine, and (3) possession with intent to use drug paraphernalia. He raises but one issue in this appeal—did the trial court err in denying his motion to suppress the evidence taken from him? We are quite convinced that it did, and so shall reverse. Both the initial stop and the search of appellant's pocket were flagrantly illegal.

The State most earnestly urges that the dragnet operation in which appellant was caught is not unlike the sobriety checkpoint procedure sustained in *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984), and it relies on *Little* and some of the cases cited in *Little* for the proposition that "the State's valid interest in executing warrants for violations of the controlled dangerous substance laws justified the limited intrusion on individual liberty." Analogizing this operation with the sobriety checkpoint procedure at issue in *Little,* in our view, is about as valid as asserting that an anaconda is like an earthworm because they are both elongated and move on their bellies.

The operation sustained in *Little* was a highly publicized and tightly regulated and controlled program designed to promote public safety by deterring drunk driving. Safety and convenience were paramount considerations in choosing the locations for the checkpoints, which were well-marked and illuminated. The locations were announced in advance, and they were set up so that motorists could easily avoid them if they chose to do so. The procedure was described by the Court at 492, 479 A.2d 903:

"A motorist wishing to avoid a sobriety checkpoint may make a U-turn or turn onto a side road prior to reaching the roadblock. No action is taken against a driver doing so unless the motorist drives erratically. For example, on several occasions, drivers ran off the road while trying to turn around and they were stopped. Likewise, a driver who stops at the checkpoint but refuses to roll down the car window is allowed to proceed. If other signs of intoxication are observed, the driver may be followed to detect signs of erratic driving. The officers operating the

checkpoint do not search the interior of the vehicle or its occupants. A flashlight is used to illuminate the driver only; the officers do not inspect the area around the driver or the remainder of the passenger compartment."

The actual stop was further described at 491:

"The regulations detail the duties of each officer attending the roadblock:

'All traffic approaching the checkpoint will be stopped as long as traffic congestion does not occur. The trooper will approach each motorist and state, "I am Trooper (*John Doe*) of the Maryland State Police. You have been stopped at a sobriety checkpoint set up to identify drunk drivers." If there is no immediate evidence of intoxication, a traffic safety brochure developed specifically for this enforcement strategy will be given to the motorist. The trooper will suggest to the motorist that he read the brochure at a later time for a more complete explanation of the stop. The motorist will then be assisted to safely proceed.'

The brochures also contain a questionnaire for the motorist to return with comments about the program. Each checkpoint stop lasts between fifteen and thirty seconds."

Citing *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979), the Court recognized at the outset that "the essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by governmental officers in order to safeguard the privacy and security of individuals against arbitrary invasions" and that " 'the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Little* [300 Md.] at 494, 479 A.2d 903.

In striking that balance, the *Little* Court drew on principles applied by the Supreme Court in condemning roving or random stops and sustaining fixed roadblock operations. Of the former, the Supreme Court had said in *Prouse*, 440

U.S. at 657, 99 S.Ct. at 1398: "Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety." In light of that, the Supreme Court made clear that such stops were permissible only when based on probable cause or articulable suspicion. *See also United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) ("Officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain [evidence of illegality]").

A fixed roadblock, properly designed and conducted, involves less intrusion and anxiety. As expressed in *United States v. Martinez–Fuerte,* 428 U.S. 543, 559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976), quoted by the *Little* Court at 496 of 300 Md., 479 A.2d 903:

" 'First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest.' "

Even fixed roadblocks must comport with certain protective criteria to pass muster, however. "As a general rule," the *Little* Court noted at 501, 479 A.2d 903,

"the constitutionality of traffic checkpoints has been upheld where: (1) the discretion of the officers in the field is carefully circumscribed by clear objective regulations established by high level administrative officials; (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) the likelihood of apprehension,

fear or surprise is reduced by a display of legitimate police authority at the roadblock; and (4) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons."

Quoting then from *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983), the Court seemingly directed that the following factors be considered in "balancing the government's interest against the intrusion on individual liberty":

" '(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.' "

*Little* [300 Md.] at 501–02, 479 A.2d 903.

There is no way that Deputy Brown's stop of appellant can be justified under any of these principles. In the first place, the State's urging to the contrary notwithstanding, this was *not* a fixed roadblock case. There was no roadblock or checkpoint of the type at issue in *Little.* As appellant pulled away, there was no indication that he was to stop; there was no physical barrier in the road nor any "police presence" alerting him to a roadblock. The street was clear, his path was unimpeded. He was stopped by a roving patrol car that was proceeding in an opposite direction and had to swerve suddenly in front of him.

Even if we were to put this into the category of a fixed roadblock and to assume that the plan was concocted by "high level administrative officials," except for the fact that

Brown was left with no discretion and was instructed to stop everyone, the operation comports with few, if any, of the protective constraints noted in *Little.* There was clearly no advance warning of this operation and no opportunity to avoid being stopped. The same confrontation would have occurred had appellant simply remained parked on Rose Street; everyone was to be stopped and checked. Unlike the situation in *Little,* there was no way that appellant or anyone else found in the area could avoid being stopped and detained. The likelihood of "apprehension, fear or surprise," far from being reduced, was assured. There is no indication in the record that safety conditions were even considered, much less maintained. The intrusion and detention, both intended and actual, were far greater than in *Little.* This was not designed to be, and was not in fact, a momentary stop and a quick glance; identification was to be requested and the person stopped was to be detained until the police had an opportunity to determine whether there were any outstanding warrants.

In short, this was the kind of operation, both in design and in execution, that is foreign to every precept embodied not only in the Fourth Amendment but in the very notion of due process of law. The police did not just violate the Constitution; they ignored it. The stop was illegal; the search of appellant's pocket was illegal; the arrest was illegal; the fruits of the search and the arrest were inadmissible as evidence; and the convictions based on it will be reversed.[5]

JUDGMENTS REVERSED; WICOMICO COUNTY TO PAY THE COSTS.

---

5. Even if the State could somehow justify the initial stop, it could never justify Deputy Van Meter's reaching directly into appellant's pocket under the circumstances revealed in this record. Neither *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) nor any of its progeny permit that kind of search absent probable cause. *See Brooks & Anderson v. State,* 78 Md.App. 471, 553 A.2d 1296 (1989).