650 A.2d 1354

**Tyrone Jerome GADSON**

v.

**STATE of Maryland.**

**No. 1729, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 28, 1994.

555

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank R. Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on brief), for appellee.

Argued before MOYLAN and FISCHER, JJ., and MARVIN H. SMITH, Judge of the Court of Appeals (Retired), Specially Assigned.

MOYLAN, Judge.

The appellant, Tyrone Jerome Gadson, was convicted in the Circuit Court for Anne Arundel County by Judge Raymond G. Thieme, Jr., sitting without a jury, of possession of cocaine with intent to distribute and of possession of marijuana with intent to distribute. On this appeal, he raises the single contention that, at the pretrial suppression hearing, Judge Thieme erroneously failed to exclude the physical evidence seized from him by the police.

The merits of the conviction are not in dispute. The case was submitted to Judge Thieme on an agreed statement of facts. On September 12, 1992, the appellant drove a truck to the guard shack in front of the Maryland House of Correction in Jessup. Maryland State Police Trooper Charles Prince searched the truck and recovered from the glove compartment three bags of crack cocaine and two bags of marijuana. Also

recovered from under the driver's seat and floor mat were cigarette rolling papers. There was also found in the truck an electronic scale. The appellant freely admitted to Trooper Prince that the drugs were his and that he sold them to pay his bills because he did not have a job. The only issue on this appeal is the Fourth Amendment reasonableness of the search of the truck that produced that evidence.

By a process of elimination, we can isolate the single narrow issue before us. To do that, it behooves us to work backward from the ultimate search to the antecedent actions that preceded that search.

### A Non–Issue:

### The Ultimate Search of the Truck

■ There can be no disputing that the ultimate search of the cab of the truck and its glove compartment for narcotics was a legitimate warrantless search under the *Carroll* Doctrine. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). A good warrantless search under the *Carroll* Doctrine or so-called "automobile exception" requires, of course, the combination of exigency plus probable cause. The ready mobility of the appellant's truck satisfied the exigency requirement. *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

■ The probable cause to believe that the truck contained contraband narcotics was supplied by "Sandy," a member of the Maryland State Police K–9 corps, who had been licensed as a certified drug detection dog and who worked regularly with Trooper Prince. As Sandy stood outside the appellant's truck, with its doors closed, he "alerted" to the presence of narcotics. That the "alert" to the presence of narcotics by a trained and certified drug-sniffing canine is ample to establish probable cause is well established law. *Snow v. State,* 84 Md.App. 243, 247–248, 578 A.2d 816 (1990); *In re Montrail M.,* 87 Md.App. 420, 435–437, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992); *Grant v. State,* 55 Md.App. 1,

14–15, 461 A.2d 524 (1983), *cert. dismissed,* 299 Md. 309, 473 A.2d 455 (1984). *See also Florida v. Royer,* 460 U.S. 491, 505–506, 103 S.Ct. 1319, 1328–1329, 75 L.Ed.2d 229, 241–242 (1983).

Looking forward from the moment when Sandy, by "alerting," communicated his belief to Trooper Prince that narcotics were in the truck, the Fourth Amendment was not offended by the ensuing warrantless *Carroll* Doctrine search of the truck for those narcotics.

### *Another Non–Issue:*

### *The Antecedent Sniffing of the Truck*

■ The question remains, however, of whether, looking backward, the Fourth Amendment was offended by Sandy's sniffing of the truck. Whether the Fourth Amendment was even involved, so as to require satisfaction, at that particular stage of the total investigative episode depends upon whether a sniff or smell by a drug detection dog constitutes a "search" within the contemplation of the Fourth Amendment. It does not.

Trooper Prince described what he and his colleagues refer to as the "drug checkpoint." He explained that after vehicles have entered the property of the Department of Corrections and are approaching the House of Correction itself, they have to come to a stop at a guardhouse. The driver is questioned by the guard on duty and advises him as to which facility the driver wishes to visit. Trooper Prince then described the *modus operandi* of the attendant scan of the vehicle by a drug sniffing canine:

> While they're at that guard house, at this time, either a Maryland State Police K–9 or Department of Corrections, Narcotics K–9, will go up and scan the vehicles. *When I say scan the vehicles I mean just walk the dog on the outside of the vehicle.* (emphasis supplied).

The elementary physics of the olfactory sense, at least in circumstances such as these, is that the dog's nose never intrudes into a constitutionally protected area, such as the

appellant's truck. It is rather the case that the dog's nose remains outside, where the dog's nose has a constitutionally unassailable right to be, and that the suspicious and incriminating vapors come wafting out across the public air to meet the dog's nose on the dog's nose's turf. We see no doctrinal difference, be the investigator man or beast, between standing outside and smelling aromas emanating from a truck, on the one hand, and standing outside and hearing sounds resonating from a truck, on the other. In each case, the sensory receptor remains outside where it has a right to be and the stimuli come out to meet it there.

If Trooper Prince, while standing outside, had himself detected a suspicious smell escaping from the truck, no one could dispute his entitlement to factor that sensory data into his accumulation of probable cause. *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). That the Maryland State Police chose to rely on Sandy's nose rather than on Trooper Prince's nose was a tactical decision without constitutional significance; it was nothing more than the most efficient deployment of the respective investigative talents of available personnel.

Utilizing an alternative framework of analysis, the Supreme Court in *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–2645, 77 L.Ed.2d 110, 121 (1983), agreed that a "canine sniff" of a piece of luggage (or of a vehicle or of a school locker, etc.) made from outside the repository does not constitute a "search" of the repository within the contemplation of the Fourth Amendment:

A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the

fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

The Supreme Court was dealing in that instance with a piece of luggage. The analysis of Justice O'Connor would apply with equal validity to any repository of possible evidence:

> [T]he canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707, 103 S.Ct. at 2644–2645. *And see In re Montrail M.*, 87 Md.App. 420, 435, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992).

Looking forward from the instant when Sandy stood close by but still scrupulously outside the truck and prepared to inhale his first whiff, the Fourth Amendment could not conceivably have been offended by the immediately ensuing sniff or sniffs for the reason that the Fourth Amendment does not guard against sniffing, reasonable or unreasonable, and was not, therefore, in any way involved.

### A Possible Issue:

### The Detention That Preceded or Attended the Sniff

The question remains, however, of whether, looking backward, the Fourth Amendment was offended by Trooper Prince's ordering of the appellant to turn off the ignition and to leave the truck in place for the few moments, described as less than a minute, that it took to bring Sandy onto the field.

Everything hinges upon the reasonableness of that brief detention—if the detention was material.

It is only by the narrowest of margins that the detention itself is, indeed, material in a Fourth Amendment sense. Before examining the reasonableness of the detention, it is necessary to determine whether it represented an actual causative link in the investigative chain or whether it was merely a coincidental measure, attendant upon the investigation to be sure but not critical to it. We gather from the testimony that, generally speaking, the drug sniffing dog and its handler are routinely present in the immediate vicinity of the guardhouse as each arriving motorist stops to respond to the questioning of the guard. In such a case, the olfactory scan by the dog would be essentially simultaneous with the conversational exchange between the motorist and the guard. Any further detention beyond pausing at the guard shack would not be indispensable in order for the dog and its trainer to carry out their scanning mission. Even a vehicle moving from a dead stop into forward gear or reverse would remain vulnerable to the sniffing process and its possibly incriminating results for the time necessary for a canine smell.

Indeed, the stated purpose of the police in ordering the motorist to turn off the ignition and to keep the vehicle immobile for the brief period of canine inspection is not to enable the dog and handler to carry out the inspection *per se* but rather to enable them to do so in a way that more adequately guarantees the safety of dog and handler:

> When we do this we have the person turn the vehicle off, take, usually take the keys out of the ignition, *that prevents the people from trying to run us over. There have been times* at the Correctional Institute *where people tried to run us over when we were trying to perform these scans.* (emphasis supplied).

If the sniffing of the appellant's truck by Sandy were going to be carried out in any event, regardless of whether the truck was at rest or was shifting into gear and beginning to move, the detention, reasonable or unreasonable, would have no

bearing on the ultimate suppression issue. Trooper Prince would have had the benefit of Sandy's olfactory sensations, whether that data was gathered safely or perilously. If the only purpose of the detention was to ensure that neither Trooper Prince nor Sandy would be hit or run over by the appellant's truck, the detention would not have been the source of the incriminating data and would have been a merely coincidental safety measure. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109–111, 98 S.Ct. 330, 332–334, 54 L.Ed.2d 331, 336–337 (1977). It is a simple matter of cause and effect. If the immobilization of the appellant's truck made the scan possible, the reasonableness of that immobilization would be material to the suppression issue. If the immobilization did nothing more than guarantee that Sandy, while sniffing, would not go in harm's way, it would be immaterial to the suppression.

In this particular case, the testimony lends itself to the interpretation that Sandy was not immediately present at the guardhouse when the appellant's truck came to a stop but had to be brought to the scene from a short distance away, albeit within a fraction of a minute. Since warrantless Fourth Amendment intrusions are presumptively unreasonable and the burden is on the State to rebut that presumption, any doubt in this regard must be resolved in the appellant's favor. We will, therefore, treat the brief detention as having been a necessary predicate for the olfactory scan and will examine its reasonableness under the Fourth Amendment.

### *Yet Another Non–Issue:*

### *Consent, Express or Implied*

It is clear that the appellant did not consent to that detention. Consent is in no way a factor in this case. After the initial brief exchange between the appellant and the guard at the guard shack, Trooper Prince approached the appellant and directed him to turn off the ignition because Sandy was about to walk around the truck and smell it. The appellant demurred, expressing his unequivocal desire to turn around and

drive away from the prison rather than to submit the vehicle to the sniffing. The appellant, however, no longer had any option. He was ordered to turn off the ignition and remain in place. He complied. Self-evidently, there was no express consent.

■ Neither is this a case in which the appellant's acquiescence to the police order could be deemed implied consent. Had the appellant gone on to proceed deeper into the prison compound and had he, for that purpose, complied with the necessary condition precedent of subjecting his truck to the dog sniff, that might be analyzed as an instance of implied consent even if no words of consent were spoken. Implied consent, moreover, is frequently relied upon as the rationale for airport searches, where proceeding through the metal detectors is a precondition for boarding the plane or even for proceeding to the departure gate. In cases of implied consent, however, the person whose consent is requested, either expressly or by the circumstances, retains the option to consent to the search or to forego entry into the prison, onto the plane, etc., thereby avoiding the search. It is an inherent characteristic of consent that it can be denied at any time or, having been given, can be revoked at any time.

The brief immobilization of the appellant's truck in this case was in direct obedience to an express order from Trooper Prince. Our Fourth Amendment examination will proceed in that context.

### The Narrow Issue:

### Ordering the Appellant Not to Drive Away

■ This, in the last analysis, is a "checkpoint" case. We are not dealing with a brief detention of the appellant at a random time or in a random place. We are dealing, rather, with the reasonableness of a required brief stop at a checkpoint. That a required stop at a checkpoint is a significant enough interference with an individual's freedom of movement to engage the gears of the Fourth Amendment was made very clear by the Supreme Court in *Michigan Dept. of State Police*

*v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412, 420 (1990), where Chief Justice Rehnquist observed:

> Petitioners concede, correctly in our view, that a Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint. The question thus becomes whether such seizures are "reasonable" under the Fourth Amendment. (citations omitted).

In *Little v. State,* 300 Md. 485, 493–494, 479 A.2d 903 (1984), the Court of Appeals spoke to the same effect. Chief Judge Murphy there observed:

> It is well recognized that stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, even though the purpose of the stop is limited and the resulting detention is quite brief. The Fourth Amendment, however, does not prohibit all seizures but only those which are unreasonable. In other words, as the Supreme Court made clear both in *Prouse* and *Martinez–Fuerte,* such seizures are not per se violative of the Fourth Amendment simply because the stop was not based on either probable cause to believe or reasonable suspicion that the motorist was engaged in conduct in violation of the criminal law. As *Prouse* states, the essential purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by governmental officers in order to safeguard the privacy and security of individuals against arbitrary invasions. Hence, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (citations omitted).

*See also Brown v. State,* 78 Md.App. 513, 553 A.2d 1317 (1989).

Although both *Michigan Dept. of State Police v. Sitz* and *Little v. State* were cases involving sobriety checkpoints, the Supreme Court in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), upheld the reasonableness of fixed checkpoints near the Mexican border to

deter and to inhibit illegal entry into the country. In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), moreover, it set out the circumstances under which checkpoints would be reasonable to further the interest of traffic safety by stopping motorists in order to inspect their operator permits and vehicle registration documents.

The common denominator of all of the checkpoint cases is that the reasonableness of the brief detention of the motorist must be measured against the societal need being served. In *Little v. State*, 300 Md. at 501, 479 A.2d 903, the Court of Appeals discussed some of the factors to be considered in the assessment of reasonableness:

> A majority of courts, however, have sustained the use of roadblocks as a proper law enforcement tool. As a general rule, the constitutionality of traffic checkpoints has been upheld where: (1) the discretion of the officers in the field is carefully circumscribed by clear objective regulations established by high level administrative officials; (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) the likelihood of apprehension, fear or surprise is reduced by a display of legitimate police authority at the roadblock; and (4) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons.

### a. The Location of the Checkpoint on a Private Access Road

As a key factor, it behooves us to look first at the location of the checkpoint in this case. The guard booth—to wit, the checkpoint—where all vehicles entering the Maryland House of Correction are required to stop is on a private access road leading from Maryland Route 175 to the House of Correction. The guard booth or checkpoint is approximately 300 yards from Route 175 along that access road. For at least 250 yards of that 300–yard approach, the visitor is on the private property of the Department of Corrections. Beyond the guard booth, it is approximately a quarter of a mile further to the House of Correction itself.

We find highly persuasive the decision of the Illinois Court of Appeals in *People v. Turnbeaugh,* 116 Ill.App.3d 199, 71 Ill.Dec. 862, 451 N.E.2d 1016 (1983), the primary authority relied on by Judge Thieme in this case. *People v. Turnbeaugh* is on all fours with the situation before us. There, as here, the defendant who was stopped had pulled off a state highway onto an access road leading to a correctional facility. In upholding the legitimacy of a stop that was actually more intrusive than the one at bar, the Illinois Court considered a key factor to be the location of the checkpoint. It described that location, 71 Ill.Dec. at 864, 451 N.E.2d at 1018:

> Defendant turned off a state highway onto an access road which leads only to Graham Correctional Center near Hillsboro, Illinois.... Defendant had driven about 50 yards on the access road when he was stopped by guard Garland Reed.... Defendant and Reynolds were ordered to open the glove box, get out of the car, unlock the trunk, and stand aside. The vehicle was then searched by a canine officer using a dog. A clear plastic bag containing cannabis was seized from the console between the seats.

It noted again, 71 Ill.Dec. at 865, 451 N.E.2d at 1019, the significance of the location:

> [I]t is important to note that vehicles travelling on the road which led only to the institution were the only ones subject to search, *i.e.,* the group is self-selected since only those who choose to go to the institution use that road. (citations omitted).

## b. *The Abundance of Notice*

Another prominent factor in assessing the Fourth Amendment reasonableness of a checkpoint in which motorists are required to stop and give appropriate response is whether the motorist has been given adequate notice that he is approaching such a checkpoint. In approving the sobriety checkpoint in *Little v. State,* Chief Judge Murphy observed, 300 Md. at 506, 479 A.2d 903, "Adequate advance warning of the checkpoint is given; motorists who do not wish to stop may make a

U-turn and follow a different route." That was also the case here.

The notice of the approaching checkpoint in this case was abundant. At a point approximately 150 yards along the access route from Maryland Route 175, the first warning sign appears. It is no mere traffic sign in dimensions but is the size of a small billboard. Framed in red and ·in large, bold capitals is the single word "WARNING." There then follows the stark message, "ALL VISITORS INCLUDING ALL VEHICLES AND OCCUPANTS ARE SUBJECT TO BE- ING SEARCHED UPON ENTERING OR EXITING THE PREMISES." A short distance further along the road is a second warning sign. Again, the word "WARNING," in all capitals, is framed in red. The message then alerts the approaching motorist of the fact that drug detection dogs are being used: "DRUG DETECTION DOG BEING UTILIZED ON INSTITUTIONAL PREMISES."

Just before the guard booth itself is a traditional octagonal "STOP" sign and the additional special warning: "ALL VE- HICLES SUBJECT TO INSPECTION." To be sure, all but the most far-sighted might have passed the point of no return by the time they could read that third warning. For purposes of the present analysis, however, the third warning was redun- dant.

Trooper Prince testified, moreover, that after the first two warning signs had been passed, there were still places along the access road where vehicles could easily have stopped and made a U-turn. He referred specifically to "a driveway on the right" and "a pull-off area on the left." He testified that on numerous occasions, vehicles had been observed making U- turns on the access road before reaching the guard booth.

Notice was also a key factor in determining that the deten- tion was reasonable in *People v. Turnbeaugh.* The Illinois Court of Appeals described the notice in that case, 71 Ill.Dec. at 864, 451 N.E.2d at 1018: ·

Defendant testified that he "assumed" that he was al- ready on institution grounds when stopped. He had already

passed 40 to 45 feet beyond a sign which stated: "ALL PERSONS AND VEHICLES ENTERING OR LEAVING THE GRAHAM CORRECTIONAL CENTER ARE SUBJECT TO SEARCH AT ANYTIME. ANY PERSON FOUND IN POSSESSION OF CONTRABAND WILL BE PROSECUTED."

It went on to comment upon the significance of that notice, 71 Ill.Dec. at 865, 451 N.E.2d at 1019:

Also significant is that visitors to the institution were warned at the point of entry by a prominent sign stating that they and their vehicles would be subject to search at any time if they continued on into the institution. Such notice bears upon the reasonableness of the selection process: Because the group subject to search is self-selected by their decision to enter the institution, it is important that this decision be made with knowledge of the risks attendant upon further pursuance of their chosen course of conduct and with an opportunity to leave behind anything which might be embarrassing or incriminating if discovered. (citation omitted).

### c.  The Absence of Arbitrary Discretion in the Police

A key factor in assessing the reasonableness of a checkpoint is whether all persons will be stopped or whether the selection of those to be checked is left to the discretion of the officers manning the checkpoint. The Court of Appeals in *Little v. State*, 300 Md. at 496, 479 A.2d 903, relied heavily on *United States v. Martinez–Fuerte*, 428 U.S. 543, 559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976), in finding that the minimizing of such police discretion was a significant factor in determining the checkpoint there under review to be reasonable:

Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that

the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class.

One of the serious contentions in *United States v. Martinez–Fuerte* with which the Supreme Court had to deal was that only a small percentage of cars passing the checkpoint were subjected to further intrusion and that this singling out process raised the specter of those selected being "stigmatized":

> The defendants arrested at the San Clemente checkpoint suggest that its operation involves a significant extra element of intrusiveness in that only a small percentage of cars are referred to the secondary inspection area, thereby "stigmatizing" those diverted and reducing the assurances provided by equal treatment of all motorists.

428 U.S. at 560, 96 S.Ct. at 3084. That same concern was what caused the Supreme Court to note in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979):

> [Our] holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. *Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.* (emphasis supplied).

In this case, *all* vehicles entering the House of Correction grounds were required to stop and to remain immobile long enough for the canine scan to be conducted. There was no Fourth Amendment risk that certain individuals might be singled out arbitrarily and the appellant, indeed, makes no claim in that regard. We note in this respect that the checkpoint here was reasonable even as was the sobriety checkpoint approved by the Court of Appeals in *Little v. State.*

"The regulations severely restrict the discretion of the officers in the field. All vehicles are stopped; there is virtually no risk that motorists will be singled out arbitrarily." 300 Md. at 506, 479 A.2d 903. Thus it was in the case here.

### d. Denying the Motorist the Option to Turn Around and Leave

The appellant argues that even as of the moment he was stopped at the guard shack and informed by Trooper Prince of the impending sniff, he should still have been given the option of turning around and leaving. We do not agree.

The societal need to reduce somehow the scourge of narcotics in the state's prison system is a compelling one. To permit a motorist carrying drugs to proceed all the way to the final barrier in order "to get the lay of the land" and then back off if a canine surveillance appeared imminent, with the unburdened option to come back and try again another day, would be an ill-advised disservice to that societal need. To require, on the other hand, a visitor who had progressed thus far into the institutional setting to stand and be subjected to scrutiny would advance that societal purpose in several ways. It would, of course, detect violations of the law *per se*. The knowledge that such a measure was in place, moreover, would deter others from even attempting unlawful smuggling. It was this consideration that caused *People v. Turnbeaugh* to note, 71 Ill.Dec. at 865, 451 N.E.2d at 1019:

> Defendant also suggests that he should at least have been given the opportunity to either consent to a search of his car or choose to depart. We disagree. An option to depart rather than be searched would constitute a one-way street for the benefit of the party planning mischief, as there is no guarantee that he would not return later and be more successful.

*And cf. State v. Manghan,* 126 N.J.Super. 162, 313 A.2d 225, 228–229 (1973).

### e. Balancing the Degree of Intrusion Against the Societal Need

The assessment of the reasonableness of a checkpoint necessarily involves a balancing of the degree of the intrusion into individual liberty against the State interest or societal need being served. In *Little v. State*, the Court of Appeals deemed the brief intrusion occasioned by a checkpoint "minimal," particularly when measured against the State's "compelling interest" in combating the problem of drunken drivers:

> Balanced against the State's compelling interest in detecting and deterring drunk driving, the intrusion on individual liberties caused by the checkpoints is minimal. The checkpoints are operated under limitations imposed by clear, carefully crafted regulations approved by high level administrators.

300 Md. at 506, 479 A.2d 903.

The intrusion occasioned by the checkpoint in this case consisted only of requiring that a motorist, already legitimately stopped at a guard shack to answer questions, turn off the ignition and allow his vehicle to remain in place for approximately one minute. We deem such an intrusion minimal.

Balanced against it was a compelling State interest approved by the highest level of governmental authority. Trooper Prince testified that it was the Governor who had requested the State Police to take over the effort to curb the flood of narcotics into the State's correctional facilities. Trooper Prince explained that approximately seventy percent of all inmates tested both at the House of Correction and at the Maryland Penitentiary test positive for some type of narcotic drug. He explained that it was in response to that epidemic problem that the Governor directed the State Police K–9 Unit to move to interdict the illegal transportation of drugs into both the House of Correction in Jessup and the Maryland Penitentiary in Baltimore. That was a clearly articulated policy.

### Conclusion

On balance, we hold that subjecting motorists who have already proceeded as far as the last sentry post guarding a sensitive facility to the modest drill of remaining in place for a quick canine surveillance was not an unreasonable defensive measure. To do less would be unthinkable. The evidence was properly not suppressed.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*