668 A.2d 22

**Tyrone Jerome GADSON**

v.

**STATE of Maryland.**

**No. 25, Sept. Term, 1995.**

Court of Appeals of Maryland.

Dec. 7, 1995.

Murphy, C.J., dissented and filed an opinion in which Rodowsky, J., joined.

4

Julia Doyle Bernhardt, Assistant Public Defender, (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Thomas K. Clancy, Assistant Attorney General, (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

The question presented in this case is whether the State may constitutionally detain a prospective visitor to a prison long enough to conduct a "canine sniff" of the visitor's motor vehicle after the visitor, upon being told of the procedure, objects and expresses a desire to leave without entering the prison. While it is absolutely proper to require the visitor to submit to such a detention as a condition of entry, we hold that absent reasonable, articulable suspicion of criminal activity, it is unreasonable under the Fourth Amendment of the United States Constitution and Article 26 of the Maryland Declaration of Rights to detain those visitors who, prior to

**6**

entering the prison, indicate a preference to leave rather than submit to the detention.

## I.

Tyrone Jerome Gadson, Petitioner, was convicted in the Circuit Court for Anne Arundel County of possession of cocaine with intent to distribute and possession of marijuana with intent to distribute. The convictions were based on evidence seized during a search of Gadson's truck, including three bags of "crack" cocaine, two bags of marijuana, an electronic scale and other drug paraphernalia. The sole issue on appeal is whether the physical evidence should have been suppressed as the fruit of an illegal seizure.

On September 13, 1992, Gadson and a friend planned to drive to the House of Correction in Jessup to drop off money for an inmate of the facility. Gadson turned off Maryland Route 175 and onto an access road leading to the prison building. The road also gives access to some houses owned by the Division of Correction and some construction trailers. After travelling up the access road approximately 300 yards, Gadson came to a stop at a "guard booth" next to the road. The House of Correction itself is located approximately a quarter of a mile beyond the booth. Although three signs along the access road warned that visitors were subject to search, Gadson testified that he failed to notice them.[1] Shortly after Gadson's truck stopped next to the guard booth, Trooper Charles Prince of the Maryland State Police approached Gadson's truck, identified himself, and informed

_____

1. Three signs on the prison access road warn that visitors are subject to search. The first is located approximately 150 yards from the point where the road turns away from Maryland Route 175. It states: "WARNING. ALL VISITORS INCLUDING ALL VEHICLES AND OCCUPANTS ARE SUBJECT TO BEING SEARCHED UPON ENTERING OR EXITING THE PREMISES." A second sign states "WARNING: DRUG DETECTION DOGS BEING UTILIZED ON INSTITUTIONAL PROPERTY," and a final sign, located at the guard booth itself, warns "STOP. ALL VEHICLES SUBJECT TO INSPECTION."

Gadson that he intended to perform a "canine sniff" of the vehicle using a trained drug detection dog named "Sandy."

Pursuant to state police policy, Trooper Prince ordered Gadson to turn off his vehicle so that he could perform the drug scan. Gadson told Trooper Prince he objected to the canine sniff, and asked for permission to leave the area. The trooper denied Gadson's request. In compliance with the trooper's order, Gadson turned off his truck and waited for the dog to be brought over. The dog "alerted" Trooper Prince that it smelled drugs in the truck, and at that point, Gadson admitted to the trooper that there was marijuana in the truck.[2] Gadson's truck was searched and the contraband seized.

At a suppression hearing before Judge Raymond G. Thieme, Jr., Trooper Prince testified that, in 1992 at the governor's request, the Maryland State Police established drug detection "checkpoints" at two state correctional facilities. The purpose of the checkpoints is to prevent transportation of drugs into the prisons. The trooper explained the typical procedure at these checkpoints is for an officer to wait until the visitor's vehicle stops at the guard shack. As the driver explains to the guard his business on the premises, a trooper approaches the vehicle and informs the driver of the required dog sniff. The driver is ordered to turn off the engine and remove the keys from the ignition. The trooper then brings the dog over to the vehicle and the sniff is performed.

Gadson argues that, once informed of the canine sniffing procedure by Trooper Prince, he should have been given the option to turn back rather than submit to further detention and the dog sniff. Judge Thieme ruled against Gadson, and that ruling was affirmed by the Court of Special Appeals. *Gadson v. State,* 102 Md.App. 554, 650 A.2d 1354 (1994). We granted certiorari to consider the important question raised in this case.

---

2. Sandy "alerts" Trooper Prince to the presence of contraband in a vehicle by sitting down and turning his head to the right when he detects the odor of narcotics.

## II.

The narrow issue before us is whether Trooper Prince's detention of Gadson at the guard shack constituted an "unreasonable seizure" within the meaning of the Fourth Amendment of the United States Constitution and Article 26 of the Maryland Declaration of Rights.[3] Gadson does not contend that the dog sniff itself implicated his Fourth Amendment rights.[4] Nor does Gadson dispute that once Sandy the dog alerted Trooper Prince to the presence of illegal drugs in the vehicle, sufficient probable cause existed to support a warrantless search of the truck. *See United States v. Dovali–Avila,* 895 F.2d 206, 207 (5th Cir.1990) (a "dog alert" is sufficient to create probable cause to conduct a warrantless vehicle search); *In re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318, 1327 (1991) (trained drug dog's reaction "properly served as probable cause to search the vehicle" without a warrant), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992). Nor does Gadson argue that the initial stop at the guard shack was not justified as a way of screening potential visitors to the prison.

Rather, Gadson's theory is that the *detention* he was required to endure in his truck after being ordered to turn off the engine and wait while Trooper Prince retrieved the dog and conducted the drug sniff constituted an unreasonable "seizure" with the meaning of the Fourth Amendment and Article 26. If Gadson is correct that the seizure was unrea-

---

3. Article 26 of the Maryland Declaration of Rights is *in pari materia* with the Fourth Amendment, and decisions of the Supreme Court interpreting the Fourth Amendment are entitled to great respect in construing Article 26. *Little v. State,* 300 Md. 485, 493 n. 3, 479 A.2d 903, 907 n. 3 (1984).

4. A dog sniff of a vehicle conducted during a lawful detention is not a "search" within the meaning of the Fourth Amendment. *United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990); *United States v. Dovali–Avila,* 895 F.2d 206, 207 (5th Cir.1990). *Accord In re Montrail M.,* 87 Md.App. 420, 436–37, 589 A.2d 1318, 1326 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992). *See also United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110, 121 (1983) (dog sniff of luggage does not constitute a "search" under Fourth Amendment).

sonable, then everything that flowed from it, including the search of Gadson's truck and the contraband that was seized during the search, was tainted and the physical evidence should have been suppressed. *See Ott v. State,* 325 Md. 206, 225, 600 A.2d 111, 120 (noting that physical evidence obtained as the result of an illegal seizure is suppressed under the "fruit of the poisonous tree" doctrine), *cert. denied, Maryland v. Ott,* 506 U.S. 904, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992).

■ There is no disputing that Trooper Prince's detaining of Gadson was a "seizure" under the Fourth Amendment. *See Little v. State,* 300 Md. 485, 493, 479 A.2d 903, 907 (1984) ("It is well recognized that stopping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, even though the purpose of the stop is limited and the resulting detention is quite brief.") (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979)). The only issue is the reasonableness of that seizure. *See Little,* 300 Md. at 493, 479 A.2d at 907 (noting that the Fourth Amendment only prohibits seizures that are unreasonable).

### III.

■ As a general rule, the Fourth Amendment prohibits police from detaining an individual, even briefly, absent some "articulable reason" that the person seized is or has been engaged in criminal activity. *Little,* 300 Md. at 494 n. 4, 479 A.2d at 907 n. 4 (citing *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357, 362 (1979)). *See also Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (A person "may not be detained even momentarily without reasonable, objective grounds for doing so."); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968) (holding that even limited seizures must be justified by "specific and articulable facts"); *United States v. Torres,* 65 F.3d 1241, 1245 (4th Cir.1995) (noting that investigative detention must be supported by reasonable, ar-

ticulable suspicion). As Chief Justice Burger explained in
*Brown*, when even a limited seizure "is not based on objective
criteria, the risk of arbitrary and abusive police practices
exceeds tolerable limits." 443 U.S. at 52, 99 S.Ct. at 2641, 61
L.Ed.2d at 363.

■ Here, the State does not contend that Trooper Prince
possessed any articulable suspicion to justify detaining Gadson
to conduct the drug sniff. Instead, the State relies on an
exception to the general rule that allows police to briefly
detain motorists at "checkpoints" even when there is no
individualized suspicion of criminal activity. *See Michigan
Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110
L.Ed.2d 412 (1990) (upholding required stop at sobriety check-
points); *United States v. Martinez–Fuerte*, 428 U.S. 543, 96
S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding required stop at
checkpoint for illegal immigrants); *Little, supra* (upholding
sobriety checkpoints). These "checkpoint" cases hold that a
limited "seizure" of motorists is permissible even without
individualized suspicion where the State's interests in conduct-
ing the stop outweigh the motorists' interest in avoiding a
relatively minor intrusion of their privacy interests. *See Sitz*,
496 U.S. at 449–55, 110 S.Ct. at 2484–88, 110 L.Ed.2d. at 419–
23; *Martinez–Fuerte*, 428 U.S. at 561–62, 96 S.Ct. at 3084–85,
49 L.Ed.2d. at 1130–31; *Little*, 300 Md. at 504–06, 479 A.2d at
912–14.

In *Little*, this Court upheld the use of "sobriety check-
points" where motorists were required to stop on a public
highway and submit to a very brief police examination for
signs of intoxication. We judged the reasonableness of the
checkpoints " 'by balancing [the] intrusion on the individual's
Fourth Amendment interests against [the] promotion of legiti-
mate government interests.' " *Little*, 300 Md. at 494, 479 A.2d
at 907 (quoting *Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396, 59
L.Ed.2d. at 667–68). Stressing the unintrusive nature of the
stops, we found that the burden on the liberties of individual
motorists was "minimal" and held, given the "State's compel-
ling interest in detecting and deterring drunk driving," that

the checkpoints were reasonable within the meaning of the Fourth Amendment and Article 26. *Little,* 300 Md. at 506, 479 A.2d at 913. Similarly, in *Sitz,* the Supreme Court found "the balance of the State's interest in preventing drunken driving . . . and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." 496 U.S. at 455, 110 S.Ct. at 2488, 110 L.Ed.2d at 423.

■■ In short, the reasonableness of a checkpoint detention is determined by balancing the intrusion of the motorist's privacy interests against the societal need served by the seizure. In the instant case, the State contends that detaining Gadson for the few moments it took to perform the dog sniff was a "minimal intrusion" that was outweighed by the State's "compelling interest" in preventing the flow of illegal narcotics into state prisons. We certainly concur with the State, and with the Court of Special Appeals, that the State has a strong interest in keeping drugs out of its correctional facilities. We hold, however, that because the seizure in this case was not designed to serve that articulated interest, it was unreasonable.

■ The undisputed testimony from the suppression hearing before Judge Thieme indicated that once Gadson learned of the dog sniff procedure, a quarter mile from the prison building, he told Trooper Prince that he wanted to leave the area rather than submit. At the hearing, Gadson testified as to what happened after he pulled up to the guard booth:

"[GADSON]: Then all of a sudden this officer comes over to my truck and tells me your truck is subject to search, something of that nature. And I was like I'm not going in I don't want you searching my truck, you know, I'll just leave. You know I'm just here to leave money and everything. And [Trooper Prince] said no, no . . . shut your vehicle off . . . [and he went to] get his dog, Sandy is his name I think.

"[DEFENSE COUNSEL]: Did he detain you at that time?

"[GADSON]: Yeah, he told me to turn my truck off and everything.

Trooper Prince testified:

"[PRINCE]: I advised [Gadson] that I needed him to shut his truck off and the [dog] scan of the vehicle would be done. It was at this time Mr. Gadson stated to me that that was all right that he would leave.... He was advised ... that since he was already on State property that a [dog] scan of the vehicle would be done."

If the purpose of the dog sniff was, as the State contends, to prevent the flow of drugs into the prison, then that purpose was fully served once Gadson agreed to turn around a quarter mile away from the prison building. At that point, the checkpoint had accomplished its stated goal. Gadson intended to turn back without entering the House of Correction. Rather than allowing Gadson to turn around, however, Trooper Prince ordered him to shut off his truck and remain at the guard shack while the canine was brought out to perform the sniff.

 There is no doubt that the detention of Gadson by Trooper Prince in this case was aimed at serving a governmental interest. That interest, however, appears to have been the detection and seizure of illegal narcotics generally, rather than, as the State suggests, keeping drugs out of the prison. As already noted, that purpose was accomplished when Gadson asked to leave. The detection and seizure of narcotics generally, although clearly a legitimate governmental interest, is beyond the scope of the articulated purpose of the prison checkpoint.[5]

 We believe there is a fundamental difference between the seizure in the case *sub judice* and those upheld in the police checkpoint cases relied on by the State. In *Little* and *Sitz, supra,* the articulated governmental interest was getting

---

5. We need not decide in this case whether a police checkpoint established for the express purpose of detecting and seizing illegal narcotics from vehicles on a public highway would violate the Fourth Amendment.

drunk drivers off the road. Clearly, if a drunk driver arriving at a sobriety checkpoint were allowed to turn back once arriving at the checkpoint, the State's interest would not be served because the intoxicated motorist would still be a public danger.[6] In *Martinez–Fuerte, supra,* the articulated state interest justifying checkpoint stops along public highways was the need to control the flow of illegal immigrants. Allowing vehicles to turn around once arriving at these checkpoints would likewise defeat the stated purpose, because illegal immigrants inside the vehicles would avoid detection and continue to be at large within the United States. On the other hand, the governmental interest asserted in the instant case, keeping illegal narcotics out of the House of Correction, *is accomplished* by turning away motorists who decline to submit to the dog sniffing procedures. Once the motorist decides to turn away from the prison checkpoint, a quarter mile away from the prison, the danger of drugs entering the prison evaporates. *See* 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 10.7(b) at 46 (2nd ed. 1987) ("A search without probable cause of a jail visitor is justified only by the need to prevent the introduction of contraband and weapons into the jail, and this is accomplished if the person declines to be searched and departs.").

▪ In essence, the State asks us to expand its authority to detain motorists beyond the time when the stated goal of the detention has already been accomplished. We decline to do so. It is well established that a limited seizure of the kind at issue here may not be extended beyond the point where its purpose has been accomplished *unless* there is reasonable, articulable suspicion of criminal activity to justify further

6. In *Little,* we noted that, under the police procedures at issue in that case, motorists were allowed to turn around before reaching the sobriety checkpoints, and that drivers who stopped at the checkpoint but refused to roll down their windows were allowed to proceed. 300 Md. at 506, 479 A.2d at 913–14. Although we stressed that these policies supported our conclusion that the checkpoint stops at issue were minimally intrusive, we did not decide whether checkpoints would be unconstitutional if drivers were not given these options to avoid the investigative purpose of the stop.

**14**

detention. *See United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994) (holding that continued detention after traffic stop for seatbelt violation was unreasonable after occupants produced valid drivers licenses and there was no objective reason to raise suspicion of criminal activity), *cert. denied,* —— U.S. ——, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995); *United States v. Walker,* 933 F.2d 812, 816 (10th Cir.1991) (holding that once police officer had fully investigated the basis for traffic stop, it was unreasonable under the Fourth Amendment to extend the duration of the stop without reasonable suspicion of other criminal activity), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v. Guzman,* 864 F.2d 1512, 1519–20 (10th Cir.1988) (same); *Munafo v. State,* 105 Md.App. 662, 673, 660 A.2d 1068, 1073 (1995) (holding that once purpose of initial traffic stop for speeding and reckless driving had been fulfilled, continued detention of driver was unreasonable without articulable suspicion); *Snow v. State,* 84 Md.App. 243, 264–65, 578 A.2d 816, 826 (1990) (finding that extension of traffic stop detention was not justified without reasonable, articulable suspicion of criminal activity once reason for initial stop had been addressed); *Powell v. State,* 649 So.2d 888, 889 (Fla.App.1995) ("A continued detention is illegal if the reason for the initial stop is resolved."). *See also Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238 ("The scope of the detention must be carefully tailored to its underlying justification."). *Cf. United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990) (upholding a dog sniff of a vehicle as reasonable because it was completed *before* police had accomplished the purpose of the checkpoint stop).

The opinion of the Court of Special Appeals in *Snow, supra,* is instructive. In *Snow,* state police stopped a vehicle for speeding on Interstate 95. After issuing Snow a warning for speeding, the officer then developed a "hunch" that there were drugs in the vehicle. Snow refused a request to search the vehicle. Nonetheless, the trooper detained Snow and a passenger long enough to conduct a drug scan of the vehicle using a trained police dog. The intermediate appellate court first

held there was a "seizure" within the meaning of the Fourth Amendment when Snow was ordered to remain by the side of the road while the trooper conducted the dog sniff. *Snow*, 84 Md.App. at 259, 578 A.2d at 824. The court then found that the seizure was unreasonable because:

> "The intrusion permitted 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229[, 238] (1983). Here, the purpose of the stop was to warn or issue a ticket to Snow for speeding. That purpose was fully fulfilled, but the detention was continued.... Although it is true that the duration of a stop is a factor in calculating whether an intrusion is within constitutional limitations ... the State must first demonstrate a reasonable, articulable suspicion that a crime is being or is about to be committed. The State, as we have stated above, did not adequately demonstrate a reasonable, articulable suspicion." (Citation omitted).

*Snow*, 84 Md.App. at 264–65, 578 A.2d at 826. Therefore, prolonging the detention was unreasonable. In sum, the court held that because police had already fulfilled the purpose of the initial stop when the officer issued a warning for speeding, and because the officer did not possess reasonable, articulable suspicion that Snow had drugs in his vehicle, there was no justification for further detention to conduct the dog sniff.

Similarly, in *Munafo, supra*, the defendant was stopped for speeding and reckless driving. He produced a valid license and registration. Rather than ending the stop promptly and sending the defendant on his way, police officers detained him for a few minutes to investigate a "hunch" that he was in possession of narcotics. The Court of Special Appeals ruled that once the purpose of an initial traffic stop has been satisfied, "continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion." *Munafo*, 105 Md.App. at 670, 660 A.2d at 1072. Since there was no sufficient basis for such suspicion, the court held that contraband seized from Munafo's

vehicle should have been suppressed. 105 Md.App. at 676, 660 A.2d at 1075.

We believe this reasoning applies here. Trooper Prince testified, and the State concedes, that the purpose of detaining Gadson at the guard shack was to prevent drugs from entering the House of Correction. Once Gadson agreed to turn back a quarter mile from the prison, that goal was fulfilled. Continued detention of Gadson would have been justified only if Trooper Prince had "reasonable, articulable suspicion" that there were drugs in Gadson's truck. The State does not contend that Trooper Prince possessed any basis for such suspicion, and none appears on the record.[7] Therefore, we hold the detention was unreasonable.

## IV.

Although the State places great emphasis on the police checkpoint cases discussed in Part III, *supra,* we believe this case is also closely analogous to those cases involving searches and seizures required as a condition of entry into secure areas, such as prisons, military installations, or commercial aircraft. In those cases, courts have held that the government may require individuals to submit to a search or seizure prior to entry, but the individual retains the right to decline entry

---

7. Trooper Prince testified that he suspected that there were drugs in the vehicle once Gadson indicated he did not want the dog sniff to proceed. When asked why he refused to allow Gadson to turn around and leave, the officer testified:

"There were several reasons. If I was to let him go by the time I made my initial contact with Mr. Gadson two other vehicles had pulled up behind us, so therefore he couldn't back up. If he went forward he would be further into the D[ivision] of Correction[] property. His comment to me that, that's okay, I'll leave, brought to my suspicions that there was something in the vehicle that he did not want the dog to find. At that time I felt that there were narcotics in the vehicle. And I did not let him leave."

It is settled that a person's refusal to consent to a search or dog sniff may not be considered in determining whether the police had reasonable, articulable suspicion of criminal activity to justify continued detention. *See United States v. Torres,* 65 F.3d 1241, 1247 (4th Cir. 1995); *Snow v. State,* 84 Md.App. 243, 260, 578 A.2d 816, 825 (1990).

rather than submit. *See United States v. Davis*, 482 F.2d 893, 910–11 (9th Cir.1973) (noting that airport screening searches are reasonable only if passengers are given the option of leaving rather than submitting); *United States v. Miles*, 480 F.2d 1217, 1219 (9th Cir.) (per curiam) (noting that searches required as a condition of entrance to a secure area of a military base are reasonable as long as individuals are given the option of avoiding the search by electing not to seek entry), *cert. denied*, 414 U.S. 1008, 94 S.Ct. 369, 38 L.Ed.2d 245 (1973); *Jordan v. Wolke*, 450 F.Supp. 213 (E.D.Wis.1978) (noting that rule governing searches required of prison visitors "should also provide that visitors will be informed that they may refuse to be searched but will thereby forfeit the opportunity to visit each time they so refuse"); *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 384 (1985) ("A visitor comes to a prison voluntarily. If he or she refuses to be searched they may leave."); LaFave, *supra*, § 10.7(b) at 46 (Suspicionless search procedures at prison gates that are "reasonable under the Fourth Amendment as means of *preventing* certain conduct should not be extended to situations in which only detection rather than prevention is accomplished."). *Contra United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973); *People v. Turnbeaugh*, 116 Ill.App.3d 199, 71 Ill.Dec. 862, 451 N.E.2d 1016 (1983).

In *Davis, supra*, the Ninth Circuit considered the constitutionality of an airport search of a passenger's briefcase prior to boarding. The court found that pre-boarding screening of all passengers and carry-on luggage was reasonable under the Fourth Amendment as a way of preventing the smuggling of weapons or explosives onto aircraft. *Davis*, 482 F.2d at 910. The court stressed, however, that such "airport screening searches are valid *only if they recognize the right of a person to avoid search by electing not to board the aircraft.*" *Davis*, 482 F.2d at 910–11 (emphasis added) (footnote omitted). The court went on to explain:

> "It is difficult to see how the need to prevent weapons and explosives from being carried aboard the plane could justify the search of a person who had elected not to board.

Perhaps it could be argued that a compelled search might lead to the apprehension of a potential hijacker, eliminating or at least reducing the chance that he would try again. Compared to the degree of additional intrusiveness that compulsory searches involve, however, this possibility seems so slight as to be inconsequential. The risk of successful hijacking is not enhanced by allowing a potential passenger to avoid a search on a particular occasion by electing not to fly.

\* \* \* \* \* \*

"Since a compelled search of persons who elect not to board would not contribute to barring weapons and explosives from the plane, it would serve only the purpose of apprehending violators of either the criminal prohibition against attempting to board an aircraft while carrying a concealed weapon, ... or some other criminal statute....

In sum, airport screening searches of the persons and immediate possessions of potential passengers for weapons and explosives are reasonable under the Fourth Amendment *provided each prospective boarder retains the right to leave rather than submit to the search.*" (Emphasis added). *Davis,* 482 F.2d at 911–12. Although *Davis* addressed the question of whether a warrantless airport *search* of a prospective passenger was reasonable, we believe the reasoning applies with equal force in the instant case, where a limited *seizure* is at issue.

More recent cases have upheld the constitutionality of x-ray screening at airports based on the theory of implied consent. In *United States v. DeAngelo,* 584 F.2d 46 (4th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979), for example, the Fourth Circuit held that once a passenger voluntarily submitted his briefcase for x-ray examination, he no longer retained the option of avoiding further inspection of the case by electing not to board the flight.[8] *Accord United*

---

8. In addition to upholding the search on the basis of implied consent, the Fourth Circuit in *United States v. DeAngelo,* 584 F.2d 46 (4th

*States v. Pulido–Baquerizo,* 800 F.2d 899 (9th Cir.1986); *United States v. Henry,* 615 F.2d 1223 (9th Cir.1980).

■ The key to these cases, however, was the fact that the passengers consented to the use of the x-ray scanning on their luggage by voluntarily surrendering it for x-ray examination. Accordingly, they are far different from the case *sub judice,* where Gadson never agreed to be detained for the dog sniff. Upon arriving at the guard shack and being told of the procedure, Gadson expressed a desire to leave rather than enter the House of correction. Hence, there was no consent, express or implied.[9]

■ In the final analysis, the pivotal question here is at what moment did Gadson reach the "point of no return;" that crucial instant when, like an airline passenger surrendering his bag for an airport x-ray scan, he consented to governmental intrusion into his privacy interests. The State would have us hold that, once Gadson reached the guard booth on the prison access road, a full quarter mile from the House of Correction, he had reached the point where he could no longer withdraw. We disagree. In our view, Gadson retained the

Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979), also held that the search was justified as a means of avoiding an "immediate danger" to people in the airport. 584 F.2d at 47. During an initial x-ray scan of DeAngelo's briefcase, a large portion of the case appeared black on the x-ray screen. Thus, the court held that it was reasonable for security officers to conclude that DeAngelo may have been carrying explosives or a gun, either of which could have posed a danger to security officers and bystanders. *Id.* Therefore, the officers were justified in opening the case as a means of preventing a possible threat to security officers and bystanders. *Id.* No such public safety concerns were present in the instant case.

9. The State places great emphasis on the three signs posted along the road leading up to the House of Correction, warning that visitors were subject to search. Although the presence of the signs may bear on the overall reasonableness of the Fourth Amendment intrusion at issue here, we doubt their presence is sufficient to support a conclusion that Gadson consented, impliedly or otherwise, to be detained by the time he reached the guard shack. *See State v. Salit,* 613 P.2d 245, 253–54 (Alaska 1980) (holding that presence of signs warning that luggage would be searched at airport was insufficient to support warrantless search on the basis of implied consent).

right to turn around and leave until the point Trooper Prince informed him of the dog sniffing procedures. Upon learning that the dog sniff was required, Gadson, like the airline passenger who walks up to the airport gate and sees that he must submit his bags for an x-ray scan, retained the right to depart from the guard booth unfettered rather than submit.

In holding that Gadson had no right to turn back from the guard booth, the Court of Special Appeals relied on *Turnbeaugh, supra,* in which the intermediate appellate court of Illinois held that a motorist who was stopped on a prison access road did not have the right to avoid a search of his vehicle by leaving the area. 71 Ill.Dec. at 865, 451 N.E.2d at 1019. The Illinois court ruled "[a]n option to depart rather than be searched would constitute a one-way street for the benefit of the party planning mischief, as there is no guarantee that he would not return later and be more successful." *Id.* We find this to be an inadequate justification for the detention. The risk that a drug smuggler might return after having been turned back from the prison guard booth and escape detection the second time is small, and we do not believe it justifies the additional intrusiveness of compulsory seizures of nonvisitors who have driven up to a checkpoint a full quarter mile from the prison itself.[10] *See* LaFave, *supra,* at 46.

### V.

The articulated purpose of the detention at issue in this case was to prevent illegal drugs from entering the House of Correction. Once Gadson agreed to turn back from the guard

---

10. The State also argues that simply turning away visitors who decline to submit to the dog sniff is insufficient because the checkpoint is not always staffed with drug detection dogs. Therefore, a drug smuggler could simply drive up to the gate repeatedly, turning away each time a dog was being used, until he arrived at a time when no dog was present. We believe the solution to this problem is to continually staff the prison with drug detection dogs, not to authorize the suspicionless detention of motorists and passengers who indicate a preference to leave without entering the prison.

booth, that purpose was wholly accomplished. Therefore, further detention could only be justified if Trooper Prince possessed reasonable, articulable suspicion that Gadson had engaged in criminal activity. Because there was no proper basis for such suspicion, the detention of Gadson was unreasonable under the Fourth Amendment and Article 26. Accordingly, the evidence discovered pursuant to that detention should have been suppressed. Therefore, we reverse.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THIS CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.*

Dissenting Opinion by MURPHY, C.J., in which RODOWSKY, J., joins.

MURPHY, Chief Judge, dissenting.

In my view, the state's interest in preventing contraband from entering prison facilities justifies the minimal intrusion at issue here. I, therefore, respectfully dissent.

As the majority correctly notes, this Court and the Supreme Court have found limited detentions of motorists to be permissible under the Fourth Amendment. *See Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984). In such cases, no particularized suspicion of wrongdoing is required when the officer conducting the detention is governed by appropriately drawn regulations and the state's interest in conducting the detention outweighs the motorist's privacy interest. *See Sitz, supra,* 496 U.S. at 449–55, 110 S.Ct. at 2484–88. I disagree with the majority's conclusion that the second of these requirements is not met.

The privacy interests in this case are far more attenuated than even the minimal interests at issue in *Sitz.* In addition to their short duration, the detentions at issue here involve a

very narrowly defined class of individuals. In *Sitz*, the Supreme Court upheld the use of drunk-driving checkpoints where every driver travelling on a public highway was stopped and subjected to a temporary seizure. *Id.* In contrast, the temporary detention at issue in this case is limited to persons who drive 300 hundred yards up a private prison access road to a guard house, intending to enter the prison grounds and having been warned by three separate signs posted on the access road that they will be subject to search and that drug dogs may be used for this purpose. Members of this limited subset of the driving population are then detained for approximately one minute while a drug sniffing dog walks around the outside of their car.

The majority asserts that the state has no interest sufficient to counterbalance this minimal intrusion. The majority distinguishes *Sitz* by asserting that "if a drunk driver arriving at a sobriety checkpoint were allowed to turn back once arriving at the checkpoint, the State's interest would not be served because the intoxicated motorist would still be a public danger." In contrast, the majority assumes that the danger of drugs entering the prison ends once a driver manifests an intent to leave the prison property.

I disagree with this conclusion. Because the drug-detecting dogs are not always present at every gate on every day, an individual attempting to introduce contraband into a prison facility will only be subject to detection some of the time. Under the majority's holding, Gadson now has a risk-free opportunity to determine whether drug dogs are in use on any particular day. Gadson can approach the gate house, "change his mind" about visiting the prison when he learns that a dog is in use, and return another day. When no dog is in use, Gadson can proceed onto the prison grounds without fear.

The question before us is whether the state's interest in preventing this sort of repeated attempt to introduce drugs into its prison facilities justifies the minimal, temporary detention of those who approach the guard house and change their mind about entering the prison once they learn that a drug dog is in use. The majority devalues the state's interest by

asserting that the state should acquire more drug detection dogs and thereby ensure that all gates to all prisons are covered on every day. In *every* Fourth Amendment decision, a citizen's privacy interest could have been more fully protected had the state adopted a more expensive alternative. *See Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 629 n. 9, 109 S.Ct. 1402, 1419 n. 9, 103 L.Ed.2d 639 (1989) (stating that "judges engaged in post hoc evaluations of government conduct 'can almost always imagine some alternative means by which the objectives of the [government] might have been accomplished'") (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985)). The alternatives available to the state are not before us, however, and we must balance the means actually chosen to protect the state's interest against the privacy interest asserted by the defendant. I believe that the state's interest in preventing repeated attempts to introduce drugs into its prisons justifies the minimal, temporary detention at issue in this case.

For the reasons stated, I would affirm the judgment of the Court of Special Appeals.

Judge RODOWSKY has authorized me to state that he concurs with the views expressed herein.